CITY OF LIVONIA v DEPARTMENT OF SOCIAL SERVICES

GREENTREES CIVIC ASSOCIATION, INC v PIGNATIELLO

Docket Nos. 70315, 70316, 71155, 71377. Argued May 8, 1984 (Calendar Nos. 1, 2).—Decided November 21, 1985.

The City of Livonia and certain residents of the city brought several actions in the Wayne Circuit Court against the Department of Social Services and others, contesting the propriety of allowing adult foster care small group homes for six or less developmentally disabled or mentally ill adults to operate in certain residential areas of the city, and seeking to permanently enjoin the licensure and operation of the homes. Previously, the city had filed complaints with the department, requesting that the licenses be denied on the ground that the homes did not comply with the Adult Foster Care Facility Licensing Act, the city's zoning ordinances and building codes, and restrictive covenants in the deeds of the homeowners in the residential areas in which the homes were to be established. The director of the department found no basis to deny the applications to operate the homes, and the city requested administrative hearings. The court, Roland L. Olzark, J., granted summary judgment for the defendants.

While appeals to the Court of Appeals were pending, administrative proceedings continued, and temporary licenses were issued to the homes. A hearing officer rejected or declined to address most of the city's challenges, but recommended that the licenses be rescinded without prejudice because the Department of Mental Health had failed to notify the city of its plan to establish the homes until after the site-selection process was completed and had failed to give the city an opportunity to present suggestions or objections. The Director of the DSS adopted the hearing officer's findings of fact and conclusions of law except as to rescission of the licenses, finding that the DSS

REFERENCES FOR POINTS IN HEADNOTES

[1-6] Am Jur 2d, Zoning and Planning §§ 108 et seq.

Applicability and application of zoning regulations to single residences employed for group living of mentally retarded persons. 32 ALR4th 1018.

[4] Am Jur 2d, Zoning and Planning § 1.

had no obligation to withhold licensure pending cooperation between the DMH and local units of government.

The Court of Appeals, BRONSON, P.J., and R. M. MAHER and WARSHAWSKY, JJ., affirmed the decisions of the circuit court in two of the cases (*Livonia I*) in an opinion per curiam, but remanded the cases to the circuit court to determine whether the DSS had failed to comply with the licensing act (Docket Nos. 59727, 59728). In the third case (*Livonia II*), the Court of Appeals, DANHOF, C.J., and N. J. KAUFMAN and D. C. RILEY, JJ., affirmed (Docket No. 59112). The plaintiffs appeal.

Greentrees Civic Association, Inc., brought an action in the Oakland Circuit Court against Joseph Pignatiello, Victory Wisdom Nonprofit Housing, Inc., and others, seeking to permanently enjoin operation of an adult foster care small group home.

Initially, the DSS had notified the City of Southfield of the proposed licensure, and meetings between the DSS, the city, the association, and the defendants were held to discuss the intended use of the home, but no solution was reached. The city filed a complaint with the DSS, alleging violation of the licensing act, but the director found no basis to deny the defendants' application. The city submitted an objection to the DSS, contesting the director's decision and requesting an administrative hearing.

The court, Robert B. Webster, J., issued a temporary restraining order which, as modified, permitted the defendants to operate the home, but prohibited placement of mentally ill adults. The City of Southfield was permitted to intervene as a party plaintiff.

Subsequently, a hearing officer rejected the city's challenge to the director's decision and recommended licensure, but agreed that mentally ill persons could not be placed in the home. The circuit court affirmed. A permanent injunction was issued by the circuit court, permitting operation of the home, but proscribing foster care for mentally ill persons. The Court of Appeals, ALLEN, P.J., and WAHLS, J. (BRONSON, J., concurring in part and dissenting in part), upheld the licensure, but concluded that the circuit court erred in enjoining placement of mentally ill adults in the home. The plaintiffs appeal.

The *Livonia* cases raised twelve issues. The issues raised in *Greentrees* correspond to issues 1, 5, and 10:

1) The repeal of the 1972 Adult Foster Care Licensing Act by the 1979 Adult Foster Care Licensing Act, coupled with the Legislature's failure to change the reference to the 1972 licensing act in § 3b of the City and Village Zoning Act, renders

adult foster care facilities no longer exempt from local zoning ordinances.

2) Even if adult foster care facilities which care for six or less adults need not comply with local zoning ordinances under § 3b of the zoning act, adult foster care small group homes at issue in these cases have a capacity for up to twelve adults and therefore must comply with applicable zoning ordinances.

3) Section 3b of the zoning act impermissibly divests home rule cities of their constitutional and statutory authority to enact zoning ordinances.

4) Section 3b of the zoning act violates the Title-Object Clause of the constitution.

5) Section 33 of the 1979 licensing act violates the Title-Object Clause of the constitution.

6) Section 16(1) of the 1979 licensing act and § 3b of the zoning act are unconstitutional because they do not provide sufficient standards for the Department of Social Services to determine what constitutes an excessive concentration of adult foster care facilities in a community.

7) The 1979 licensing act and the zoning act violate due process because they provide inadequate notice and opportunity for a hearing prior to licensure and deprive parties of a fair and impartial decisionmaker.

8) The DSS failed to comply with the notice requirements of § 32 of the 1979 licensing act and § 3b of the zoning act.

9) Additional statutory and ordinance violations preclude the licensure of the houses as adult foster care small group homes.

10) Under the 1979 licensing act, mentally ill adults cannot be placed in adult foster care small group homes.

11) The operation of an adult foster care small group home in these houses would violate building and use restrictions contained in the owners' deeds.

12) The defendants' motions for summary judgment should have been denied because of the existence of material factual disputes.

In an opinion by Justice CAVANAGH, joined by Chief Justice WILLIAMS, and Justices LEVIN, RYAN, BRICKLEY, and BOYLE, the Supreme Court *held:*

1. Adult foster care facilities remain exempt from local zoning ordinances.

Section 3b(1) of the City and Village Zoning Act should be read in connection with and interpreted in light of the 1979 Adult Foster Care Facility Licensing Act, and a strict construction of § 3b(1) cannot be followed if it would defeat an impor-

tant purpose of the licensing act. An examination of the 1979 licensing act and its legislative history reveals no intent to subject adult foster care facilities caring for six or less adults to local zoning restrictions. The failure of the Legislature to change the reference in § 3b(1) of the zoning act from the 1972 licensing act to the 1979 licensing act does not render adult foster care facilities subject to local zoning ordinances, but, rather, must be viewed as a legislative oversight. The reference to the 1972 act was only necessary for the informational purpose of indicating under what statute such facilities were licensed at the time § 3b was enacted.

2. An adult foster care facility providing care and supervision for six or less persons is engaged in a residential use of property and is thus exempt from local zoning ordinances.

Section 3b(2) of the zoning act and the 1979 licensing act indicate no legislative intention to limit the applicability of § 3b(2) to adult foster care family homes. Section 3b requires that the provision by a state-licensed residential care facility of supervision or care to six or less persons be considered engaged in a residential use by local governments. Such facilities need not be licensed for the care of six or fewer persons to be considered meeting the residential use exemption; rather, the criterion is whether a facility is actually providing care to six or fewer persons. The exemption concerns the actual number of residents of the facility, not the potential number. Adult foster care family homes and small group homes for six or less adults are to be treated identically with regard to zoning restrictions.

3. Section 3b of the zoning act does not impermissibly divest home rule cities of constitutional and statutory authority to enact zoning ordinances.

Absent enabling legislation, a political subdivision has no inherent power to zone. The constitution gives home rule cities full power over their own property, not private property within their boundaries. The Home Rule Cities Act allows a city to provide in its charter for the establishment of districts or zones within which the use of land and structures may be regulated by ordinance. Local ordinances must give way to conflicting constitutional and statutory provisions. Section 3b was enacted to implement the policy of the state that persons in need of community residential care not be excluded by zoning from the benefits of normal residential surroundings, and furthers the constitutional goal to foster and support institutions, programs, and services for the seriously handicapped.

4. Section 3b of the zoning act does not violate the Title-Object Clause of the constitution which requires that a law

must not embrace more than one object and the object of a law must be expressed in its title.

An act may contain all matters germane to its object and any provisions which directly relate to, carry out, and implement the principal object. Legislation should not be invalidated merely because it contains more than one means of attaining its primary object. A restriction on a municipality's zoning power clearly belongs in the act granting the power. Zoning regulations must further designated legislated goals. The object of the zoning act is to enable cities and villages to regulate in a reasonable manner the use of land and structures within their boundaries. Section 3b merely defines and furthers the explicit statutory goal of providing for the health, education, and welfare of persons in need of community residential care.

5. Section 33 of the 1979 licensing act does not violate the Title-Object Clause of the constitution.

The act does not contain more than one object. Section 33 is germane to the general purpose of the act to license and regulate adult foster care facilities and simply precludes a municipality from inappropriately applying local construction and fire ordinance provisions to adult foster care homes so as to prohibit the practical exclusion of such homes from residential neighborhoods.

6. Section 16(1) of the 1979 licensing act and § 3b of the zoning act do not unconstitutionally delegate legislative authority to the DSS by requiring the agency to determine whether there is an excessive concentration of community residential facilities before issuing a license for an adult foster care facility.

Standards provided in a statute which are to be applied by an administrative agency must be sufficiently broad to permit efficient administration. The standard should be construed with reference to the entire act; it should be as reasonably precise as the subject matter requires or permits, and it should be read, if possible, so as to render it valid. The standards required to determine excessive concentration of adult foster care facilities are sufficiently defined to enable the agency to carry out the purposes of the acts and also to protect resident homeowners from the exercise of uncontrolled, arbitrary power by administrative officials.

7. The 1979 licensing act and the zoning act do not violate due process. They provide for adequate notice and for an opportunity for a hearing prior to licensure of adult foster care facilities, and provide for a fair and impartial decisionmaker.

The procedures prescribed under the acts provide adequate

notice, and the plaintiffs received a hearing. Moreover, the plaintiffs are not entitled to a hearing prior to licensure. Procedural due process requirements apply only where there is a deprivation of liberty or property. In these cases, the city would have been deprived of no liberty or property interest by the issuance of licenses prior to administrative hearings, and the plaintiff homeowners failed to sufficiently allege any deprivation of property rights. The issuance of a license does not rezone property.

The DSS, through its director and hearing officers, was the decisionmaker. The director and the DSS were joined as defendants in the injunctive action while administrative proceedings were pending. However, under the facts of the case, the director was not so immediately and personally enmeshed as to automatically preclude the rendering of an impartial administrative decision. The director did not personally conduct the initial investigation of the applicants and facilities; nor did he preside as the factfinder during the administrative hearing, but reviewed the initial complaints and issued a final decision based on the hearing officer's findings. Mere familiarity with the facts of a case obtained during the performance of a statutory duty does not disqualify a decisionmaker. Nor is disqualification required because the decisionmaker has taken a public position on an issue.

8. Failure of the DSS to technically comply with the notice requirements of § 32 of the 1979 licensing act and § 3b of the zoning act does not require rescission of the licenses. The DSS substantially complied with the requirements, and the plaintiffs did not allege, nor does the record reveal, that they were prejudiced by the noncompliance.

9. No violations by the DSS of §§ 9(2) and 13(4) of the licensing act or of § 7 of the zoning act were shown to have occurred. Any noncompliance under § 33 of the licensing act did not constitute an immediate clear and present danger and was governed by administrative rules.

10. All adult foster care facilities may provide foster care to mentally ill persons.

The Legislature intended that adult foster care facilities be used to "mainstream" persons hospitalized for psychological problems. Not every mentally ill person is a proper candidate for such placement, however. Foster care facilities were not designed to provide treatment for mentally ill persons. Their principal function is to provide supervision, personal care, and protection of residents. Once a person no longer requires treatment, as defined in the Mental Health Code, for mental illness,

the person may be a suitable candidate for placement in a foster care facility. Small group homes for six or less adults cannot accept or keep a person whose behavior requires isolation or restraint, and may not admit a person whose care and service requirements are incompatible with those of other residents.

11. Operation of the adult foster care small group homes in these cases does not violate building and use restrictions in the deeds of the homeowners.

The restrictive covenant which specifically limits the type of structure that can be built and the purpose to which the structure may be put is not violated. The house in question is a single family dwelling used for residential purposes. The residents of the house function as a fixed housekeeping and social unit and thus as a family. Any increase in traffic and parking problems with regard to all the homes is no greater than that which could have arisen had a large traditional family occupied the homes.

12. The defendants' motions for summary judgment were properly granted. No material factual dispute was presented; all the issues presented involved questions of law.

*Livonia I,* affirmed, except as to the order of remand.

*Livonia II,* affirmed.

*Greentrees,* affirmed.

Justice RILEY took no part in the decision of these cases.

119 Mich App 806; 328 NW2d 1 (1982) affirmed.

123 Mich App 1; 333 NW2d 151 (1983) affirmed.

123 Mich App 767; 333 NW2d 350 (1983) affirmed.

1. ZONING — MENTAL HEALTH — ADULT FOSTER CARE FACILITIES.

State-licensed adult foster care facilities providing care and supervision for six or less persons are engaged in a residential use of property and are exempt from local zoning ordinances; the criterion for the exemption is the actual number of residents of a facility, not the potential number for which it is licensed (1976 PA 396, MCL 125.583b; MSA 5.2933[2]; 1979 PA 218, MCL 400.701 *et seq.;* MSA 16.610[51] *et seq.*).

2. ZONING — HOME RULE CITIES — MENTAL HEALTH — ADULT FOSTER CARE FACILITIES.

A home rule city may provide in its charter for the zoning by ordinance of land and structure use within its boundaries; such ordinances must give way, however, to conflicting constitutional and statutory provisions such as the constitutional goal of developing programs for the handicapped and the provisions of

the Adult Foster Care Facility Licensing Act and the City and Village Zoning Act (Const 1963, art 7, § 22, art 8, § 8; MCL 117.4i, 125.583b, 400.701 *et seq.;* MSA 5.2082, 5.2933[2], 16.610[51] *et seq.*).

3. ZONING — CONSTITUTIONAL LAW — TITLE-OBJECT CLAUSE — MENTAL HEALTH — ADULT FOSTER CARE FACILITIES.

Section 3b of the City and Village Zoning Act and § 33 of the Adult Foster Care Facility Licensing Act do not violate the Title-Object Clause of the Michigan Constitution; the object of the zoning act is to enable cities and villages to regulate the use of land and structures within their boundaries, and § 3b merely defines further the goal of providing for persons in need of community residential care, while § 33 of the licensing act is germane to the purposes of the act to license and regulate adult foster care facilities and simply precludes application of local ordinances so as to practically exclude such facilities from residential neighborhoods (Const 1963, art 4, § 24; MCL 125.583b, 400.733; MSA 5.2933[2], 16.610[83]).

4. ZONING — CONSTITUTIONAL LAW — MENTAL HEALTH — ADULT FOSTER CARE FACILITIES — LEGISLATIVE AUTHORITY.

Section 16(1) of the Adult Foster Care Facility Licensing Act and § 3b of the City and Village Zoning Act which prescribe standards to be applied by the Department of Social Services in determining whether an excessive concentration of community residential facilities exists before issuing a license for an adult foster care facility are sufficiently defined to enable the agency to carry out the purposes of the acts and do not unconstitutionally delegate legislative power to the agency (MCL 125.583b, 400.715[1]; MSA 5.2933[2], 16.610[66][1]).

5. ZONING — MENTAL HEALTH — ADULT FOSTER CARE FACILITIES — DUE PROCESS.

The Adult Foster Care Facility Licensing Act and the City and Village Zoning Act provide for adequate notice and for an opportunity for a hearing prior to licensure of adult foster care facilities, and for a fair and impartial decisionmaker (US Const, Am XIV; Const 1963, art 1, § 17; MCL 125.581 *et seq.,* 400.701 *et seq.;* MSA 5.2931 *et seq.,* 16.610[51] *et seq.*).

6. MENTAL HEALTH — ADULT FOSTER CARE FACILITIES — MENTALLY ILL PERSONS.

All adult foster care facilities may provide foster care for mentally ill persons who no longer require treatment or hospitalization for mental illness (MCL 330.1001 *et seq.,* 400.701 *et seq.;*

MSA 14.800[1] *et seq.,* 16.610[51] *et seq.;* 1984 AACS, R 400.2303[4]).

*Harry C. Tatigian,* Livonia City Attorney, and *Cathy L. Kerby,* Assistant City Attorney, for the plaintiffs in *Livonia.*

*Michael G. Weiss* and *Stuart J. Rice* for Greentrees Civic Association, Inc.

*Phillip L. Poole,* Southfield Deputy City Attorney for the City of Southfield.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Janis Meija* and *William K. Basinger,* Assistant Attorneys General, for the Department of Social Services.

*Garrett & Rogers, P.C.* (by *Jon R. Garrett),* for the defendants in *Livonia.*

*Dolores M. Coulter* for Michigan Protection & Advocacy Service for Developmentally Disabled Citizens, Inc., intervening defendants in *Livonia.*

*T. Gordon Scupholm, II,* for the defendants in *Greentrees.*

Amici Curiae in *Livonia:*

*Marsha Lynn Tuck* for Association for Retarded Citizens/Michigan, Inc.

*Clan Crawford, Jr.,* for Michigan Association of Municipal Attorneys and Public Corporation Section of the State Bar of Michigan.

Amici Curiae in *Greentrees:*

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Janis Meija* and

*William K. Basinger,* Assistant Attorneys General, in support of defendants.

*Jon R. Garrett* for Metropolitan Detroit Public Interest Law Center.

*Dolores M. Coulter* for Michigan Protection & Advocacy Service for Developmentally Disabled Citizens, Inc.

CAVANAGH, J. Plaintiffs contest the propriety of allowing four adult foster care (AFC) small group homes for six or less developmentally disabled or mentally ill adults to operate in several residential areas of Livonia and Southfield, Michigan. They raise a variety of challenges to the 1979 Adult Foster Care Facility Licensing Act (AFCFLA), 1979 PA 218, MCL 400.701 *et seq.;* MSA 16.610(51) *et seq.,* and § 3b of the City and Village Zoning Act (CVZA), 1921 PA 207, as amended by 1976 PA 396, MCL 125.583b; MSA 5.2933(2). We reject each of plaintiffs' challenges.

I

*Livonia v DSS*

Three of these cases involve AFC small group homes located in residential areas of Livonia, Michigan. Defendants R. Roberts Residential Services, Inc., Brant Homes, Inc., and Human Services and Aftercare, Inc., are nonprofit corporations. Each corporation filed an unrelated application with the Department of Social Services (DSS) for a temporary license to operate an AFC small group home for six or less developmentally disabled persons. In January and February, 1981, the DSS notified the City of Livonia Bureau of Inspection of these applications and its intent to issue

three temporary licenses. On March 19, 1981, the city attorney filed three separate complaints with the DSS requesting that the licenses be denied because of alleged noncompliance with the AFCFLA, Livonia zoning ordinances and building code, and restrictive covenants in the homeowners' deeds. On May 4, 1981, the Director of the DSS responded that there was no basis to deny any of the applications.

In response to this decision, the city submitted a written objection with the DSS on May 11, 1981, and requested an administrative hearing. In addition, the city and several homeowners filed three separate suits in the Wayne Circuit Court on April 1 and 2, 1981, seeking to permanently enjoin the licensure and operation of the homes. Temporary restraining orders were entered in each case prohibiting the DSS from issuing the licenses. However, by July, 1981, defendants' motions for summary judgment had been granted in each case, and the temporary restraining orders were dissolved. Plaintiffs appealed these decisions to the Court of Appeals.

The administrative proceedings continued while the appeals were pending. Pursuant to MCL 400.723(3); MSA 16.610(73)(3), temporary licenses were issued to the AFC small group homes prior to the resolution of the administrative proceedings. In an opinion dated November 25, 1981, a hearing officer rejected or declined to address most of the city's challenges. He nevertheless recommended that the licenses be rescinded without prejudice because the Department of Mental Health (DMH) had failed to notify the city of its plan to establish the homes until after the site-selection process was completed and had failed to give the city an oppor-

tunity to present suggestions or objections.[1] On December 17, 1981, the Director of the DSS adopted the hearing officer's findings of fact and conclusions of law, except insofar as the hearing officer had recommended rescission. The director found that the DSS had "no legal obligation" to withhold licensure pending cooperation between the DMH and local units of government. The licensures were therefore upheld. Plaintiffs apparently did not appeal this administrative decision to the circuit court.

The Court of Appeals upheld the circuit court decisions concerning the Roberts and Brant homes in *City of Livonia v Dep't of Social Services,* 119 Mich App 806; 328 NW2d 1 (1982) (hereinafter *Livonia I*). However, the Court believed that the cases should be remanded to determine whether the DSS had failed to comply with the AFCFLA on prior occasions. As to the Human Services home, the Court of Appeals, in an opinion by Justice RILEY, affirmed in all respects. *City of Livonia v Dep't of Social Services,* 123 Mich App 1; 333 NW2d 151 (1983) (hereinafter *Livonia II*). We granted plaintiffs' applications for leave to appeal. 418 Mich 874 (1983).

*Greentrees Civic Ass'n v Pignatiello*

Defendant Victory Wisdom Nonprofit Housing, Inc., a nonprofit corporation, applied to the DSS for a license to operate an AFC small group home for six or less women in a residential neighborhood of Southfield, Michigan. The women were to be selected from the residents of Clinton Valley Center, a state psychiatric facility, after appropriate

---

[1] The DMH is the state agency which contracts with public or private entities to provide care for persons with mental health problems. See MCL 330.1116(j), 330.1152; MSA 14.800(116)(j), 14.800(152). Once the DMH has decided to establish an AFC small group home, the home must be approved and licensed by the DSS under the AFCFLA.

screenings. The home is adjacent to the Greentrees subdivision. Plaintiff Greentrees Civic Association is a group of subdivision homeowners.

The DSS notified the City of Southfield of the proposed licensure in August, 1980. Defendants and representatives of the DSS, the city, and the association met several times to discuss the intended use of the home, but could not reach a mutually agreeable solution. On September 19, 1980, the city attorney filed a complaint with the DSS, alleging that the proposed licensure would violate the AFCFLA. The Director of the DSS responded on November 6, 1980, that there was no basis to deny defendants' application.

In response, plaintiff association filed suit in the Oakland Circuit Court on November 21, 1980, seeking to permanently enjoin the operation of the home.[2] A temporary restraining order was entered prohibiting defendants from operating any type of AFC facility. The City of Southfield was subsequently allowed to intervene. The restraining order was modified on March 31, 1981, to allow defendants to operate an AFC small group home, but prohibited the placement of mentally ill adults therein.

In the meantime, the city attorney submitted a written objection with the DSS on December 1, 1980, contesting the director's decision and requesting an administrative hearing. In an opinion dated May 4, 1981, the hearing officer rejected two of the city's challenges, but agreed that mentally ill persons could not be placed in the home. On June 16, 1981, the Director of the DSS adopted the hearing officer's recommendation that the home should be licensed. However, he concluded that the AFCFLA permitted placement of mentally ill per-

---

[2] The DSS was not joined as a defendant in this litigation.

sons in AFC small group homes because the terms "emotionally disturbed" and "mentally ill" are used synonymously in the act. The city appealed this administrative decision to the Oakland Circuit Court on June 29, 1981. The circuit court subsequently affirmed after *Oxford Twp v Dep't of Social Services,* 120 Mich App 103; 327 NW2d 409 (1982), was issued. The city's appeal of that decision is currently pending in the Court of Appeals.[3]

Shortly after the Director of the DSS issued his decision, the independent injunctive action was resolved. The circuit court ruled that defendants could operate an AFC small group home, but could not provide foster care to mentally ill persons. A permanent injunction to that effect was issued on July 1, 1981. Defendants appealed the injunctive order and plaintiffs cross-appealed the decision permitting plaintiffs to operate the home.

While that appeal was pending, plaintiffs filed a petition for an order to show cause with the circuit court, alleging that defendants had violated the July 1, 1981, injunction by placing mentally ill adults in the home. On January 15, 1982, the circuit court ordered an independent psychiatric evaluation of the five resident women. The psychiatrist concluded that each resident was both developmentally disabled and suffering from some degree of mental illness. The Director of Community Placement for the DMH had previously concluded that the women were only developmentally disabled. Apparently no hearings have been conducted to resolve this dispute.

The Court of Appeals subsequently upheld the licensure of the home. The majority also concluded that the circuit court had erred in enjoining the

[3] This Court denied the city's emergency delayed application for leave to appeal prior to decision by the Court of Appeals on February 28, 1984 (Docket No. 73246).

placement of mentally ill adults therein. *Greentrees Civic Ass'n v Pignatiello,* 123 Mich App 767; 333 NW2d 350 (1983). We granted plaintiffs' application for leave to appeal. 418 Mich 880 (1983).

## II

We begin our analysis with an overview of the movement toward deinstitutionalization and community placement of adults requiring foster care. Prior to the early 1960's, mentally retarded and other developmentally disabled persons were routinely institutionalized. Institutionalization was initially designed to shelter such persons from the risks of society. By the early twentieth century, however, the rationale for institutionalization changed to that of protecting society from these persons. By the 1960's, a "distinct humanistic renaissance" had occurred, which stressed the "normalization" of disabled individuals.[4] According to this approach, disabled persons who are unable to live with their families are allowed to reside in homes of normal size, located in normal neighborhoods, that provide opportunities for normal societal integration and interaction. Such community placement permits disabled persons to reach their full potential and become contributing, productive members of society.[5]

Some communities, however, were and are reluctant to allow "community," "group," or "foster care" homes in residential areas. Zoning ordinances and practices have been used either to exclude such homes entirely or to restrict them to commercial areas. The result frequently is the

---

[4] Mason & Menolascino, *The right to treatment for mentally retarded citizens: An evolving legal & scientific interface,* 10 Creighton L R 124, 127-138 (1976).

[5] *Zoning for community homes serving developmentally disabled persons,* 2 Mental Disability L Rptr 794, 795 (May-June 1978).

creation of "ghettos" of foster care homes, particularly in transitional residential areas, business, or institutional zones. Such concentrations of foster care homes often change the character of the neighborhoods, thus undercutting the purposes behind normalization and provoking negative reactions by area residents.[6]

Many states have enacted statutes governing community residential facilities for developmentally disabled, physically handicapped, mentally ill, or aged persons.[7] 1972 PA 287, MCL 331.681 *et seq.;* MSA 16.610(1) *et seq.* (hereinafter 1972 AFCFLA), was this state's initial effort to license and regulate AFC facilities that provide alternative care services to adults who do not require institutional medical or nursing care.[8] The 1972 AFCFLA did not categorize AFC facilities by the number of persons who resided therein, nor did it designate the types of disabled persons for whom care could be provided.[9] The administrative rules promul-

---

[6] *Id.,* pp 795-796.

[7] See *State laws & programs serving elderly persons & disabled adults,* 7 Mental Disability L Rptr 158 (March-April 1983). In addition, the American Bar Association's Commission on Legal Problems of the Elderly and the Commission on the Mentally Disabled have drafted a model act for regulating "board and care" homes for the aged and disabled. See Beyer, Bulkley & Hopkins, *A model act regulating board & care homes: Guidelines for states,* 8 Mental Disability L Rptr 150 (March-April 1984).

In an effort to upgrade conditions in facilities providing foster care, the Social Security Act was amended by 90 Stat 2687; 42 USC 1382e, effective October 1, 1977, to require state certification of homes which serve a significant number of Supplemental Security Income (SSI) recipients. The only sanction for failure to comply, however, is a reduction of the recipient's SSI benefits paid to the facility. See 42 USC 1382e(e).

[8] The title of 1972 PA 287 stated that it was

"AN ACT to provide for the licensing and regulation of adult foster care facilities providing alternate care services including room and board, supervision, assistance, protection and personal care to adults not requiring organized institutional medical or nursing care . . . ."

[9] "Adult foster care facility" was defined as "an establishment which provides supervision, assistance, protection or personal care, in

gated by the Director of the DSS, however, defined three classes of AFC facilities:

1) family homes, which provided care to no more than six adults with at least one caretaker being required to reside in the home, 1979 AC, R 400.2103(3), 400.2202(2);

2) group homes, which provided care to more than six but no more than twenty adults, 1979 AC, R 400.2103(5); and

3) congregate facilities, which provided care to more than twenty adults. 1979 AC, R 400.2102(5).[10]

In addition, the rules allowed placement of mentally ill adults in AFC family homes. See 1979 AC, R 400.2211(e), (g).[11]

To prevent municipalities from using zoning ordinances as a basis for excluding or segregating AFC facilities, the Legislature in 1976 added § 16a to the County Rural Zoning Enabling Act, MCL 125.216a; MSA 5.2961(16a), § 16a to the Township Rural Zoning Act, MCL 125.286a; MSA 5.2963(16a), and § 3b to the City and Village Zoning Act, MCL 125.583b; MSA 5.2933(2).[12] These sections each provide that a state-licensed residential facility, as defined in 1972 PA 287, which provides supervision or care to six or less persons shall be considered a residential use of property for zoning purposes and a permitted use in all residential zones. The amendments also: require

addition to room and board, to adults." Homes for the aged, nursing homes, mental hospitals, child caring institutions, children's camps, foster family homes, and foster family group homes were not considered to be AFC facilities. 1972 PA 287, § 2, as amended by 1978 PA 435; codified at former MCL 331.682; MSA 16.610(2).

[10] The administrative rules governing AFC facilities were significantly revised in 1984. See 1984 AACS, R 400.1401 *et seq.*

[11] However, an AFC family home could not accept or keep any person whose behavior required isolation or restraint, or whose care requirements and program needs were incompatible with the other residents' needs. 1979 AC, R 400.2203(3).

[12] See 1976 PA 394, 395, and 396.

notification of the appropriate county, township, city, or village as to the location of the proposed AFC facility; prevent facilities from being located in proximity to each other; and forbid licensure of a proposed facility if it will "substantially contribute to an excessive concentration of state licensed residential facilities" within that particular community.

In 1979, the Legislature repealed 1972 PA 287 and replaced it with a more extensive act—1979 PA 218, MCL 400.701 *et seq.;* MSA 16.610(51) *et seq.* (hereinafter 1979 AFCFLA). The House Legislative Analysis of HB 4104, which became 1979 PA 218, reveals that the 1979 AFCFLA was designed to provide more specificity and to deal with circumstances which had not been foreseen at the time the original AFCFLA was enacted. In addition, the Legislature wished to classify, license, and regulate homes for the aged as AFC facilities.

Under the 1979 AFCFLA, "adult foster care facility" is defined as an establishment having as its principal function the receiving of adults for foster care. It includes facilities and homes for aged, emotionally disturbed, developmentally disabled, or physically handicapped adults who require ongoing supervision, but not continuous nursing care. As in the prior act, certain institutions are not considered AFC facilities. These include nursing homes, homes for the aged, general hospitals, hospitals for the mentally ill, facilities for the developmentally disabled, county infirmaries, child care institutions, children's camps, foster family homes, foster family group homes, alcohol or substance abuse rehabilitation centers, residential facilities for persons released from or assigned to adult correctional institutions, maternity homes, and hotels or rooming houses which do not provide or offer foster care. As of March 27, 1984, homes for

the aged were to be categorized as AFC facilities. MCL 400.703(4); MSA 16.610(53)(4).

In addition, the 1979 AFCFLA established five categories of AFC facilities:

1) camps, which provide care to more than four adults in a facility located in a natural or rural environment, MCL 400.703(2); MSA 16.610(53)(2);

2) family homes, which provide care to six or fewer adults in private residences, the licensee of a family home being required to be a member of the household and an occupant of the residence, MCL 400.703(5); MSA 16.610(53)(5);

3) small group homes, which provide care to twelve or fewer adults, MCL 400.703(7); MSA 16.610(53)(7);

4) large group homes, which provide care to at least thirteen but not more than twenty adults, MCL 400.703(6); MSA 16.610(53)(6); and

5) congregate facilities, which provide care to more than twenty adults, MCL 400.703(3); MSA 16.610(53)(3).

Beginning on March 27, 1984, large group homes and congregate facilities would have been required to elect between accepting adults who were aged and adults who were mentally ill, developmentally disabled or physically handicapped. See 1979 PA 218, § 3(3), (6), codified at MCL 400.703(3), (6); MSA 16.610(53)(3), (6). However, 1984 PA 40, effective March 26, 1984, dropped this requirement, as well as other provisions relating to the licensing of homes for the aged as AFC facilities.

As of the date of this opinion, the Legislature has not amended the references to 1972 PA 287 contained in the three aforementioned zoning acts to reflect the passage of the 1979 AFCFLA.

III

In *Livonia v DSS*, plaintiffs city and homeowners assert:

1) The repeal of the 1972 AFCFLA by the 1979 AFCFLA, coupled with the Legislature's failure to change the reference to 1972 PA 287 in § 3b of the City and Village Zoning Act (CVZA), means that AFC facilities are no longer exempt from local zoning ordinances.

2) Even if AFC facilities which care for six or less adults need not comply with local zoning ordinances under § 3b of the CVZA, the AFC small group homes at issue here have a capacity of up to twelve adults and therefore must comply with applicable zoning ordinances.

3) Section 3b of the CVZA impermissibly divests home rule cities of their constitutional and statutory authority to enact zoning ordinances.

4) Section 3b of the CVZA violates the Title-Object Clause of Const 1963, art 4, § 24.

5) Section 33 of the 1979 AFCFLA violates the Title-Object Clause of Const 1963, art 4, § 24.

6) Section 16(1) of the 1979 AFCFLA and § 3b of the CVZA are unconstitutional because they do not provide sufficient standards for the DSS to determine what constitutes an "excessive concentration" of AFC facilities in a community.

7) The 1979 AFCFLA and CVZA violate the Due Process Clause because they provide inadequate notice and opportunity for a hearing prior to licensure and deprive parties of a fair and impartial decisionmaker.

8) The DSS failed to comply with the notice requirements of § 32 of the 1979 AFCFLA and § 3b of the CVZA.

9) Additional statutory and ordinance violations preclude the licensure of the houses as AFC small group homes.

10) Under the 1979 AFCFLA, mentally ill adults cannot be placed in AFC small group homes.

11) The operation of an AFC small group home in these houses would violate building and use restrictions contained in the owners' deeds.

12) Defendants' motions for summary judgment should have been denied under GCR 1963, 117.2(3).

In *Greentrees Civic Ass'n v Pignatiello,* plaintiffs city and homeowners present three issues which correspond to Issues 1, 5, and 10 above.

IV

*Applicability of § 3b of the CVZA (Issues 1 and 2)*

Section 3b of the CVZA presently provides:

(1) As used in this section, *"state licensed residential facility" means a structure constructed for residential purposes that is licensed by the state pursuant to Act No. 287 of the Public Acts of 1972, as amended, being sections 331.681 to 331.694 of the Michigan Compiled Laws,* or Act No. 116 of the Public Acts of 1973, as amended, being sections 722.111 to 722.128 of the Michigan Compiled Laws, which provides resident services for 6 or less persons under 24-hour supervision or care for persons in need of that supervision or care.

(2) In order to implement the policy of this state that persons in need of community residential care shall not be excluded by zoning from the benefits of normal residential surroundings, a state licensed residential facility providing supervision or care, or both, to 6 or less persons shall be considered a residential use of property for the purposes of zoning and a permitted use in all residential zones, including those zoned for single family dwellings, and shall not be subject to a special use or conditional use permit or procedure different from those required for other dwellings of similar density in the same zone. [MCL 125.583b; MSA 5.2933(2). Emphasis supplied.]

Plaintiffs argue that since 1972 PA 287 was

repealed by § 35 of the 1979 AFCFLA, MCL 400.735; MSA 16.610(85), and § 3b(1) of the CVZA has not been amended to include a reference to 1979 PA 218, the AFC small group homes at issue here cannot be considered a residential use of property under § 3b(2) of the CVZA. Plaintiffs believe that this legislative inaction evidences an intent that all new AFC facilities must now conform to local zoning ordinances.[13] In the instant case, the respective Livonia and Southfield zoning ordinances would allegedly prohibit defendants from establishing AFC small group homes for six or less adults in residential neighborhoods.[14]

The goal of statutory construction is to ascertain and give effect to the intent of the Legislature. If the language of a statute is clear and unambiguous, the intent must be determined accordingly and no judicial interpretation is warranted. *Dussia v Monroe Co Employees Retirement System,* 386 Mich 244, 248; 191 NW2d 307 (1971); *Melia v Employment Security Comm,* 346 Mich 544, 562; 78 NW2d 273 (1956). Viewed in isolation, § 3b(1) does limit the definition of "state licensed residential facility" to those facilities licensed under 1972 PA 287 or 1973 PA 116. However, such a limited view is not appropriate here. Section 3b of the

[13] The City of Livonia admits that an AFC facility for six or less which was properly licensed under the 1972 AFCFLA and § 3b of the CVZA can continue operating in a residential area without conforming to local zoning ordinances, since it would qualify as a valid prior nonconforming use.

[14] The neighborhoods in which the Livonia AFC small group homes are located are zoned R-1-A. The Livonia zoning ordinances preclude the utilization of R-1-A property for any business or commercial use. The neighborhood in which the Southfield AFC small group home is located is zoned R-2. Under the Southfield zoning ordinances, R-2 land can be used only for one-family dwellings occupied by a single family which cannot include more than five unrelated persons. No commercial or boarding house uses are permitted. Both cities believe that the operation of an AFC small group home constitutes a non-family commercial use of property.

CVZA and the 1972 AFCFLA both related to the regulation of AFC facilities caring for six or less adults and have always been read *in pari materia.* Although the 1979 AFCFLA contains significant revisions, it is still concerned with the regulation of AFC facilities for six or less adults. Thus, § 3b(1) should be read in connection with and interpreted in light of the 1979 AFCFLA, even though they were enacted at different times. A strict construction of § 3b(1) cannot be followed if that construction would defeat an important purpose of the 1979 AFCFLA. See *County Rd Ass'n of Michigan v Bd of State Canvassers,* 407 Mich 101, 109; 282 NW2d 774 (1979); *Detroit v Michigan Bell Telephone Co,* 374 Mich 543, 558, 560; 132 NW2d 660 (1965), *cert den* 382 US 107 (1965).

An examination of the 1979 AFCFLA and its legislative history reveals no legislative intent to subject AFC facilities caring for six or less adults to local zoning restrictions. In response to an argument that family homes and small group homes for six or less adults should not be treated differently under the 1979 AFCFLA, the House Legislative Analysis of HB 4104 noted:

> The differences between a foster care home occupied by the licensee . . . and a nonprofit home occupied by a resident manager are significant enough to warrant placing them in separate categories. . . . [However, b]eing classified as a small group home will not be burdensome to nonprofit homes with six or fewer clients. . . . [A]ll adult foster care homes with six or fewer adults are [presently] protected against zoning restrictions, regardless of whether they are private residences or nonprofit adult foster care facilities; there is no suggestion that that will change with a change in the categories of homes. [Emphasis added.]

Furthermore, § 16(2) of the 1979 AFCFLA, MCL

400.716(2); MSA 16.610(66)(2), states that a temporary license to operate an AFC facility for more than six adults shall not be granted if the proposed facility has not obtained zoning approval or a special or conditional use permit if required by local ordinance. By negative implication, facilities for six or less adults need not obtain such approval. In addition, § 16(3) specifically incorporates by reference § 3b of the CVZA, as well as the other pertinent sections of the County and Township Rural Zoning Acts:

> *The department shall not issue a temporary license to an adult foster care facility which does not comply with* section 16a of Act No. 183 of the Public Acts of 1943, as amended, being section 125.216a of the Michigan Compiled Laws, section 16a of Act No. 184 of the Public Acts of 1943, as amended, being section 125.286a of the Michigan Compiled Laws, and *section 3b of Act No. 207 of the Public Acts of 1921, as amended, being section 125.583b of the Michigan Compiled Laws.* [MCL 400.716(3); MSA 16.610(66)(3). Emphasis added.]

Finally, we note that MCL 8.3u; MSA 2.212(21) allows us to update the reference to the AFCFLA:

> The provisions of any law or statute which is re-enacted, amended or revised, so far as they are the same as those of prior laws, shall be construed as a continuation of such laws and not as new enactments. *If any provision of a law is repealed and in substance re-enacted, a reference in any other law to the repealed provision shall be deemed a reference to the re-enacted provision.*

The reference in § 3b(1) is to the entire 1972 AFCFLA. Although there are significant revisions in the 1979 AFCFLA, it was intended to cover the same subject matter as the prior act and retains many

of the prior provisions and departmental rules promulgated thereunder. We agree with Justice RILEY's observations that the reference to 1972 PA 287 "was only necessary for the informational purpose of indicating under what statute such facilities were *then* state licensed" and that the failure to change the reference must be viewed as a "legislative oversight." *Livonia II,* 123 Mich App 7-8. If plaintiffs' literal interpretation were adopted, the placement of disabled persons into the community could be significantly impaired, a result not intended by the Legislature.[15]

Plaintiffs further contend that even if § 3b of the CVZA permits AFC facilities for six or less adults to operate in residential areas regardless of zoning restrictions, it is inapplicable to AFC small group

[15] Plaintiffs further argue that if § 3b of the CVZA was impliedly amended by the passage of the 1979 AFCFLA, Const 1963, art 4, § 25 has been violated. That constitutional provision states:

"No law shall be revised, altered or amended by reference to its title only. The section or sections of the act altered or amended shall be re-enacted and published at length."

We reject plaintiffs' argument for the reasons stated in *Dearborn v Dep't of Social Services,* 120 Mich App 125, 133-134; 327 NW2d 419 (1982), *lv den* 417 Mich 1078 (1983):

"It is undisputed that the Legislature did not reenact and republish MCL 125.583b; MSA 5.2933(2) following the passage of the Adult Foster Care Facility Licensing Act, 1979 PA 218; MCL 400.701 *et seq.;* MSA 16.610(51) *et seq.* Nevertheless, Const 1963, art 4, § 25 is not violated unless the statute amending the act which has not been reenacted or published dispenses with or changes any provision of the amended act. *Midland Twp v State Boundary Comm,* 401 Mich 641, 659; 259 NW2d 326 (1977). As noted above, we believe the Legislature intended, with the passage of the new adult foster care statute, that the zoning exemption in MCL 125.583b; MSA 5.2933(2) apply to facilities licensed under the new act. However, we are not convinced that in doing so the Legislature actually dispensed with or changed any provision of the statute. Although under the new foster care act the licensee of a facility need not be a member of the *facility household,* the threshold requirement of MCL 125.583b; MSA 5.2933(2) remains unchanged. To benefit from the zoning exemption the facilities must, in any case, provide 24-hour care for [six or less] residents. Thus, the enactment of 1979 PA 218 did not dispense with or change the statute provisions so as to violate Const 1963, art 4, § 25."

homes. They reason that at the time § 3b was enacted, there was no "small group home" category—only family homes were authorized to care for six or less adults. Although the AFC small group homes at issue here are licensed to care for no more than six adults, plaintiffs note that such homes are statutorily authorized by definition to receive up to twelve adults.

Regardless of the circumstances existing at the time § 3b was enacted, the plain language of § 3b(2) and the 1979 AFCFLA indicate no legislative intention to limit the applicability of § 3b(2) to AFC family homes. We agree with Justice RILEY's reasoning on this point:

> Section 3b of 1921 PA 207 as amended requires that a state licensed residential care facility "providing supervision or care, or both, to 6 or less persons" be considered a residential use by local governments. *Plaintiffs' argument overlooks the fact that this statute does not provide that facilities must be "licensed" for the care of six or fewer to be considered residential uses; rather, the criterion is whether a facility is actually providing care to six or fewer persons. The exemption is obviously concerned with the number of residents actually living in the facility, not the number of potential residents.* See *Brandon Twp* [*v North-Oakland Residential Services, Inc,* 110 Mich App 300, 309; 312 NW2d 238 (1981), *lv den* 412 Mich 900 (1982)]. Moreover, the applicant in the case at bar only sought a license for a facility to care for six or fewer persons and, therefore, the small group home license issued by defendant department was restricted to six or fewer persons. Our conclusion in this regard is supported by the statutory provisions under the new Adult Foster Care Facility Licensing Act. MCL 400.713(5); MSA 16.610(63)(5) requires a license for an adult foster care facility to state the maximum number of persons to be received for foster care at one time. Any increase

beyond six in the number of persons to be received for foster care at one time in a small group home requires application for a temporary license. MCL 400.719(3); MSA 16.610(69)(3). A proposed adult foster care facility for more than six adults must obtain zoning approval or obtain a special or conditional use permit if required by a local ordinance before a temporary license can be granted. MCL 400.716(2); MSA 16.610(66)(2). Thus, if a structure has the capacity for more than six residents, it may not expand beyond six without conforming to local zoning ordinances. Therefore, limiting the exemption to family homes is not necessary to insure that facilities with more than six residents will comply with zoning ordinances. [*Livonia, II,* 123 Mich App 9-10. Emphasis added.]

We also note that the previously quoted portion of the House Legislative Analysis of HB 4104 also supports the conclusion that AFC family homes and small group homes for six or less adults are to be treated identically vis-à-vis zoning restrictions.

*Section 3b's Limitation on a City's Power to Zone (Issue 3)*

Plaintiffs argue that a municipality's power to enact zoning ordinances is derived from Const 1963, art 7, § 22 and the Home Rule Cities Act, MCL 117.1 *et seq.;* MSA 5.2071 *et seq.* Pursuant to that power, the City of Livonia enacted zoning ordinances which would prevent AFC small group homes from operating in residential areas without prior approval from the city. Section 3b of the CVZA conflicts with these ordinances since it requires that state-licensed residential facilities for six or less persons be treated as a permitted use in all residential zones. Plaintiffs conclude that this conflict impermissibly "divests" or limits a city's constitutional and statutory right to zone.

Plaintiffs concede that *Clements v McCabe,* 210

Mich 207; 177 NW 722 (1920), squarely held that a city's power to enact zoning ordinances is not derived from the state constitution or the Home Rule Cities Act. They note, however, that *Clements* was decided prior to *Village of Euclid v Ambler Realty Co,* 272 US 365; 47 S Ct 114; 71 L Ed 303 (1926). Plaintiffs believe that *Euclid* impliedly overruled *Clements* and rendered "nugatory, though not invalid," the CVZA.

In *Euclid,* an aggrieved property owner maintained that the village's zoning scheme was unreasonable and confiscatory. The United States Supreme Court upheld the zoning plan as a reasonable exercise of the municipality's police power. However, the Supreme Court did not have to address where or how the village had obtained its zoning power;[16] the focus was on the reasonableness of the exercise thereof.[17]

In contrast, *Clements* addressed the source of a city's power to zone. This Court noted that the "police power" is an inherent attribute of the state which belongs to subordinate governmental divisions only when and as conferred by the state through the constitution or statute. Incorporation invests a city with limited police powers, but the power to zone is not one of them. After examining the 1908 Constitution and the then-existing Home Rule Cities Act, 1909 PA 279, this Court concluded that they contained no express or implied mention of the power to zone. 210 Mich 215-218. Since *Clements,* this Court has repeatedly held that, in

[16] The Supreme Court noted that Euclid was a politically separate municipality "with powers of its own and authority to govern itself as it sees fit *within the limits of the organic law of its creation and the State and Federal Constitutions."* 272 US 389. (Emphasis added.)

[17] This Court has consistently followed the principles enunciated in *Euclid.* See, *e.g., Detroit Edison Co v City of Wixom,* 382 Mich 673, 686-687; 172 NW2d 382 (1969), and cases cited therein; *Anderson v City of Holland,* 344 Mich 706, 709; 74 NW2d 894 (1956).

the absence of state enabling legislation, a political subdivision has no inherent power to zone. See, *e.g., Delta Charter Twp v Dinolfo,* 419 Mich 253, 260, n 2; 351 NW2d 831 (1984); *Detroit Osteopathic Hospital v City of Southfield,* 377 Mich 128, 132; 139 NW2d 728 (1966); *Krajenke Buick Sales v Hamtramck City Engineer,* 322 Mich 250, 254-255; 33 NW2d 781 (1948).[18] In response to *Clements,* the Legislature enacted the cvza, 1921 PA 207.

Plaintiffs also contend that *Clements* is no longer viable because it was based upon an interpretation of the 1908 Constitution. Although Const 1963, art 7, § 22 is similar to Const 1908, art 8, § 21, plaintiffs note that the former provision contains a specific reference to "property" as a matter upon which ordinances can be enacted.[19] Neverthe-

---

[18] Plaintiffs urge us to follow the reasoning of *Garcia v Siffrin Residential Ass'n,* 63 Ohio St 2d 259; 17 Ohio Op 3d 167; 407 NE2d 1369 (1980), *cert den* 450 US 911 (1981). The Ohio Supreme Court in that case invalidated a statute analogous to § 3b of the cvza which purportedly superseded a local zoning ordinance barring facilities for the mentally retarded from residential areas. We do not view *Garcia* as persuasive authority, since the relevant Ohio constitutional provisions and case law are sufficiently dissimilar to our own constitution and jurisprudence. The *Garcia* Court noted that § 3, art XVIII of the Ohio Constitution directly conferred the power to zone upon municipalities and therefore further enabling statutes were unnecessary. However, *Euclid* was not cited as authority for this proposition of law, but *Pritz v Messer,* 112 Ohio St 628; 149 NE 30 (1925), which was decided prior to *Euclid* was cited.

[19] Const 1963, art 7, § 22 provides:

"Under general laws the electors of each city and village shall have the power and authority to frame, adopt and amend its charter, and to amend an existing charter of the city or village heretofore granted or enacted by the legislature for the government of the city or village. *Each such city and village shall have power to adopt resolutions and ordinances relating to its municipal concerns, property and government, subject to the constitution and law.* No enumeration of powers granted to cities and villages in this constitution shall limit or restrict the general grant of authority conferred by this section." (Emphasis added.)

Const 1908, art 8, § 21 provides:

"Under such general laws, the electors of each city and village shall have power and authority to frame, adopt and amend its charter and to amend an existing charter of the city or village heretofore granted

less, the Convention Comments to Const 1963, art 7, § 22 clearly indicate that the new language was intended to give home rule cities full power over their *own* property, rather than private property within their boundaries.[20] There is no evidence that any of the homes in these cases is owned by the cities.

We note that after *Clements* was decided, § 4i was added to the Home Rule Cities Act. See 1929 PA 126, MCL 117.4i; MSA 5.2082. Subsection (3) specifically allows a city to provide in its charter for the establishment of districts or zones within which the use of land and structures may be regulated by ordinance. We do not find this statute to be in conflict with § 3b of the CVZA, since it merely authorizes a city to adopt charter provisions and ordinances related to zoning. Moreover, local ordinances must give way to conflicting constitutional and statutory provisions. See Const 1963, art 7, § 22; MCL 117.2, 117.36; MSA 5.2072, 5.2116; *Dearden v Detroit,* 403 Mich 257, 264; 269 NW2d 139 (1978).

We recognize that prior to 1976, the CVZA permitted cities to enact reasonable zoning ordinances restricting the placement of AFC facilities in residential areas. Once a power has been granted to a political subdivision, it should not be artificially limited. *Delta Charter Twp, supra,* 419 Mich 260, n 2; Const 1963, art 7, § 34. This has not occurred here. Section 3b was enacted "to implement the policy of this state that persons in need of commu-

___

or passed by the legislature for the government of the city or village and, *through its regularly constituted authority, to pass all laws and ordinances relating to its municipal concerns, subject to the Constitution and general laws of this state."* (Emphasis added.)

[20] The 1963 Convention Comments state:

"The new language is a more positive statement of municipal powers, giving home rule cities and villages full power over their own property and government, subject to the constitution and law."

nity residential care shall not be excluded by zoning from the benefits of normal residential surroundings . . . ." MCL 125.583b(2); MSA 5.2933(2)(2). This policy furthers the goals of Const 1963, art 8, § 8:

> Institutions, programs and services for the care, treatment, education, or rehabilitation of those inhabitants who are physically, mentally, or otherwise seriously handicapped shall always be fostered and supported.

As the Convention Comments note, this constitutional provision was revised because the prior language was "not only too restrictive in scope, but in certain cases ha[d become] outmoded by recent developments in the field of physical and mental rehabilitation. The words 'programs and services' [were] added as broader concepts not necessarily confined to institutional treatment."

*Title-Object Clause Challenges to § 3b of the CVZA and § 33 of the 1979 AFCFLA (Issues 4 and 5)*

Const 1963, art 4, § 24 provides in pertinent part:

> No law shall embrace more than one object, which shall be expressed in its title.

This constitutional provision requires that 1) a law shall not embrace more than one object, and 2) the object of a law must be expressed in its title. *Advisory Opinion re Constitutionality of 1975 PA 227,* 396 Mich 123, 128; 240 NW2d 193 (1976).

Plaintiffs maintain that § 3b of the CVZA and § 33 of the 1979 AFCFLA violate the Title-Object Clause of Const 1963, art 4, § 24. As to the former statute, plaintiffs concede that the title of the CVZA

accurately reflects the purpose of § 3b, *i.e.*, "to designate the use of certain state licensed residential facilities . . . ." Thus, the second constitutional requirement has been satisfied. Plaintiffs argue, however, that the addition of § 3b by 1976 PA 396 impermissibly created a second object within the CVZA. They reason that prior to the addition of § 3b, the sole object of the CVZA was to grant to cities and villages the power to enact zoning ordinances. In contrast, § 3b limits that grant of power by requiring cities and villages to treat state-licensed residential facilities as permissible residential uses of property.

The Court of Appeals in *Greentrees* succinctly summarized the applicable rules of law:

> The purpose of the ["one object"] constitutional limitation is to insure that both the legislators and the public have proper notice of legislative content and to prevent deceit and subterfuge. *Advisory Opinion re Constitutionality of 1972 PA 294,* 389 Mich 441, 465; 208 NW2d 469 (1973). However, in effectuating these purposes, the "one object" provision is to be construed reasonably and not in so narrow or technical a manner as to frustrate the legislative intent. *Kuhn v Dep't of Treasury,* 384 Mich 378, 387-388; 183 NW2d 796 (1971). An act may contain all matters germane to its object and any provisions which "directly relate to, carry out and implement the principal object." *Advisory Opinion, supra,* pp 465-467. [123 Mich App 771.]

The "object" of a law is its general purpose or aim. *Local No 1644, AFSCME v Oakwood Hospital Corp,* 367 Mich 79, 91; 116 NW2d 314 (1962). The object of the CVZA is to enable cities and villages to regulate in a reasonable manner the use of land and structures within their boundaries. However, a city's power to zone is not unfettered—its zoning regulations must further certain legislatively des-

ignated goals. Section 1 of the CVZA, MCL 125.581; MSA 5.2931, states:

> (1) The legislative body of a city or village may regulate and restrict the use of land and structures; . . . to insure that uses of the land shall be situated in appropriate locations and relationships; . . . to facilitate adequate and efficient provision for . . . education, recreation, and other public service and facility needs; and to promote public health, safety, and welfare, and for those purposes may divide a city or village into districts of the number, shape, and areas considered best suited to carry out this section. . . .
>
> (2) The land development regulations and districts authorized by this act shall be made in accordance with a plan designed to promote and accomplish the objectives of this act.

Section 3b merely defines and furthers the explicit statutory goal of providing for the health, education, and welfare of persons in need of community residential care. We agree with the Court of Appeals conclusion that "[a] restriction on a municipality's zoning power clearly belongs in the act granting that power." *Livonia I,* 119 Mich App 809.

Plaintiffs attack § 33 of the 1979 AFCFLA on two grounds. First, they believe that § 33 impermissibly creates a second object, *i.e.,* to preempt local ordinances, regulations, and construction codes regulating institutions. This objective allegedly does not fall within the act's stated object of licensing and regulating AFC facilities. Second, plaintiffs believe that the purpose of § 33 is not expressed in the title of the AFCFLA.

The title to the 1979 AFCFLA states that it is

> AN ACT to provide for the licensing and regulation of adult foster care facilities; to provide for the

establishment of standards of care for adult foster care facilities; to prescribe powers and duties of the department of social services and other departments, to prescribe penalties; and to repeal certain acts and parts of acts.

Section 33 provides:

This act supersedes all local regulations applicable specifically to adult foster care facilities. Local ordinances, regulations, or construction codes regulating institutions shall not be applied to adult foster care large group homes, adult foster care small group homes, or adult foster care family homes. This section shall not be construed to exempt adult foster care facilities from local construction codes which are applicable to private residences. [MCL 400.733; MSA 16.610(83).]

As previously noted, an act may contain any provision which directly relates to, carries out, and implements the principal object of the act. Legislation should not be invalidated merely because it contains more than one means of attaining its primary object. *Local No 1644, supra.* However, if the act contains "subjects diverse in their nature, and having no necessary connection," it violates Const 1963, art 4, § 24. *Advisory Opinion,* 396 Mich 131, quoting *People ex rel Drake v Mahaney,* 13 Mich 481, 494-495 (1865).

For the reasons stated by the intervenor-defendants, we conclude that the 1979 AFCFLA does not contain more than one object:

[Section] 33 of the act simply precludes a municipality from inappropriately applying the construction code provisions intended to govern institutions to the subject foster care residences. The provision is certainly germane to the general purpose of providing for the licensing and regulation

of foster care homes. In the absence of the supersession clause, some municipalities may be inclined to treat adult foster care homes, which are intended to be "normalized residential settings," as hospitals, and thus impose numerous requirements which are not imposed on private residential dwellings. The legislative intent is clear that the subject homes be regarded as homes; the expression of that intent so as to prohibit the practical exclusion of such homes from residential neighborhoods by municipalities acting under the guise of [local construction and fire ordinances] is logical and entirely relevant to the act and its title.

Plaintiffs suggest that the restrictions on the applicability of the State Construction Code Act of 1972, MCL 125.1501 *et seq.;* MSA 5.2949(1) *et seq.,* should have been added to that act, rather than the AFCFLA. However, the Legislature is free either to enact an entirely new act or to amend any act to which the subject of the new legislation is germane, auxiliary, or incidental. This legislative choice will not be invalidated merely because an alternative location for the new legislation might appear to some to be more appropriate. *People v Milton,* 393 Mich 234, 241; 224 NW2d 266 (1974).

Contrary to plaintiffs' assertions, § 33 will not jeopardize the lives, safety, and welfare of the residents of AFC homes by eliminating all construction and fire safety requirements. Section 33 specifically allows municipalities to enforce local construction codes which are applicable to private residences. Moreover, §§ 10, 11, and 20 of the AFCFLA require the Department of Social Services to promulgate and enforce adequate fire prevention and safety rules governing AFC facilities. See MCL 400.710, 400.711, 400.720; MSA 16.610(60), 16.610(61), 16.610(70).[21]

---

[21] The most recent administrative rules governing fire safety in AFC

As to plaintiffs' contention that the title of the AFCFLA does not adequately reflect the provisions of § 33, it is not necessary that a title be an index of all of an act's provisions. It is sufficient that "the act centers to one main general object or purpose which the title comprehensively declares, though in general terms, and if provisions in the body of the act not directly mentioned in the title are germane, auxiliary, or incidental to that general purpose . . . ." *Milton,* 393 Mich 246-247, quoting *Loomis v Rogers,* 197 Mich 265, 271; 163 NW 1018 (1917). In light of our conclusion that § 33 is germane to the act's stated purpose of licensing and regulating AFC facilities, we find that the title is sufficiently comprehensive.

*Adequacy of Standards for Determining What Constitutes an "Excessive Concentration of State-Licensed Residential Facilities" (Issue 6)*

Section 16(1) of the AFCFLA, MCL 400.716(1); MSA 16.610(66)(1), states that the DSS cannot issue a temporary license to a proposed AFC facility without local approval if the issuance "would substantially contribute to an excessive concentration of community residential facilities within a city, village, or township." Section 3b(4) of the CVZA, MCL 125.583b(4); MSA 5.2933(2)(4), contains a similar provision. Plaintiffs note that neither the Legislature nor the DSS has defined the term "excessive concentration" or provided any standards or guidelines to aid the DSS in making its licensing determinations. Plaintiffs believe that the term is a subjective one and that its interpretation "can vary from case-to-case, from community-to-community, and from one interpreter of the phrase to

small group homes for six or less adults appear in 1984 AACS, R 400.1601-400.1613.

another," thus resulting in arbitrary and discriminatory treatment. They therefore conclude that the entire AFCFLA and § 3b of the CVZA should be declared unconstitutional since the "excessive concentration" standard is not as reasonably precise as the legislation requires.

In determining whether legislative standards, or lack thereof, constitute an unconstitutional delegation of legislative authority to an administrative agency, the following observations and rules of law must be applied:

> The rule with regard to delegation was simply and aptly stated in the leading case of *Locke's Appeal,* 72 Pa 491, 498-499 (1873):
> "The legislature cannot delegate its power to make a law; but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this would be to stop the wheels of government."
> The difficulty, as this Court on a previous occasion suggested, "is in determining whether the limits [on the exercise of discretion conferred on the administrative official] are sufficiently defined to avoid delegation of legislative powers." *Argo Oil Corp v Atwood,* 274 Mich 47, 52; 264 NW 285 (1935).
> In making this determination whether the statute contains sufficient limits or standards we must be mindful of the fact that such standards must be sufficiently broad to permit efficient administration in order to properly carry out the policy of the Legislature but not so broad as to leave the people unprotected from uncontrolled, arbitrary power in the hands of administrative officials.
> While no hard and fast rule exists for determining whether a given statute has provided sufficient standards, a number of guiding principles have evolved in Michigan jurisprudence to assist in making a determination in this case.

First, the act in question must be read as a whole; the provision in question should not be isolated but must be construed with reference to the entire act. . . .

Second, the standard should be "as reasonably precise as the subject matter requires or permits." . . .

The preciseness of the standard will vary with the complexity and/or the degree to which subject regulated will require constantly changing regulation. . . .

Third, if possible the statute must be construed in such a way as to "render it valid, not invalid," as conferring "administrative, not legislative" power and as vesting "discretionary, not arbitrary, authority." [*Dep't of Natural Resources v Seaman,* 396 Mich 299, 308-309; 240 NW2d 206 (1976).]

Looking at the AFCFLA, § 16(1) requires that the determination of excessive concentration be made with reference to the particular city, village, or township in which the proposed AFC facility is to be located. In other words, the DSS cannot look to the number of facilities or residents located in another municipality. Furthermore, § 16(3) states that a temporary license cannot be issued to an AFC facility which does not comply with § 3b of the CVZA. Section 3b(4) provides in pertinent part:

A state licensing agency shall not license a proposed residential facility when another state licensed residential facility exists within the 1,500 foot radius, unless permitted by local zoning ordinances, of the proposed location or when the issuance of the license would substantially contribute to an excessive concentration of state licensed residential facilities within the city or village. In a city with a population of 1,000,000 or more a state licensing agency shall not license a proposed residential facility when another state licensed residential facility exists within a 3,000 foot radius of the proposed location.

Thus, the DSS must also consider the physical proximity of the proposed facility to other residential facilities as one factor in deciding whether to issue a license. Finally, § 3b(2) provides that persons in need of community residential care are entitled to "the benefits of normal residential surroundings . . . ." The DSS therefore must consider the overall residential character of the surrounding neighborhood as it exists and how that character will be changed, if at all, by the addition of an AFC facility. Such an inquiry also protects resident homeowners from the creation of foster care home "ghettos" which would destroy the residential character of the neighborhood.

As to the second and third *Seaman* tests, we adopt Justice RILEY's analysis and conclusion that the standards enunciated in the AFCFLA and § 3b of the CVZA are sufficiently precise:

> [I]t is clear that the licensing and regulation of adult foster care residential facilities is a subject that requires some degree of flexibility. The Legislature has established, by statute, a specific maximum density for adult foster care facilities. The "excessive concentration" criteria is only applicable to situations where the concentration of homes is allegedly excessive even though it satisfies the statutory maximum density. Any attempt to specifically set forth further criteria for determining whether excessive concentration has occurred would be impractical as the level of permissible concentration may well vary according to the constantly changing demographic characteristics of a particular community. Such a determination inherently requires the exercise of some limited discretion. We hold that, under the present scenario, the defendant department is permitted to exercise such discretion while it is prohibited from acting arbitrarily and, therefore, we find that these statutes are valid as they confer administrative and not legislative power and as they vest

> discretionary and not arbitrary authority. Our
> conclusion in this regard is bolstered by the rule of
> statutory construction which requires this Court to
> afford a statute the presumption of constitutional-
> ity and to construe it as constitutional unless the
> contrary clearly appears. *People v McQuillan,* 392
> Mich 511; 221 NW2d 569 (1974). [*Livonia II,* 123
> Mich App 16-17.]

We note that even where the Legislature has
properly delegated authority to an administrative
agency, the agency cannot act arbitrarily and
must provide adequate procedural due process to
the parties involved. Where legislative standards
are by necessity somewhat general in nature, this
Court must determine whether the parties had
adequate notice, opportunity to be heard, and
review of an adverse decision. *Seaman,* 396 Mich
313-314. See also *Dukesherer Farms, Inc v Direc-
tor of Dep't of Agriculture (After Remand),* 405
Mich 1, 30, n 8; 273 NW2d 877 (1979); *Westervelt v
Natural Resources Comm,* 402 Mich 412, 447-449,
458-459; 263 NW2d 564 (1978) (opinions of WIL-
LIAMS, J., and RYAN, J.). These due process consid-
erations are the basis of plaintiffs' next challenge.

*Due Process Challenges (Issue 7)*

Plaintiffs raise three arguments, the first two of
which are interrelated. First, plaintiffs believe that
the issuance of a license pursuant to § 23(3) of the
AFCFLA, MCL 400.723(3); MSA 16.610(73)(3), prior
to an administrative hearing violates the Due
Process Clause. Second, plaintiff homeowners con-
tend that the AFCFLA's failure to provide them
with adequate notice and any opportunity for a
hearing prior to the licensure of an AFC facility
similarly deprives them of their property rights
without due process of law. Finally, plaintiffs ar-
gue that the final decisionmaker in the adminis-

trative process—the Director of the DSS—was not impartial because of his prior roles in these cases.

We begin our analysis with an overview of the AFCFLA's procedures for licensing an AFC facility. Before issuing a license, the DSS must investigate the applicant and facility. MCL 400.713(3); MSA 16.610(63)(3). If the DSS decides that it will issue a license, it must notify the city of its plans at least forty-five days before the licensure. MCL 125.583b(4); MSA 5.2933(2)(4), MCL 400.732(1); MSA 16.610(82)(1). The city in turn must notify all residents whose property lines are within a 1500-foot radius of the proposed facility. MCL 125.583b(4); MSA 5.2933(2)(4).

A city that wishes to contest the DSS' decision to issue a license may file a complaint with the DSS. Within forty-five days, the DSS must resolve the issues raised in the complaint. If the city disagrees with the response, it must submit a written objection to the DSS within thirty days after receiving the response. The Director of the DSS, or a designated representative, must then conduct a hearing.[22] The DSS may nevertheless issue the license pending resolution of the administrative proceedings. MCL 400.723; MSA 16.610(73). A person aggrieved by the decision of the Director of the DSS must appeal to the circuit court within ten days after receipt of the decision. MCL 400.725; MSA 16.610(75).

Turning to plaintiffs' arguments concerning the adequacy of notice and hearing, we initially conclude that the AFCFLA provides adequate notice to a city and nearby property owners prior to a proposed licensure.[23] The remaining question is

---

[22] The hearing must be conducted in accordance with Chapter 4 of the Administrative Procedures Act, MCL 24.271-24.287; MSA 3.560(171)-3.560(187).

[23] In light of our conclusion in Issue 8, below, that the city received

whether the city and owners here were entitled to a hearing before the licenses were issued. The short answer is that plaintiffs received a hearing during the injunctive action. The licensures of the Livonia homes did not occur until after the circuit court had decided plaintiffs' case on the merits and dissolved the temporary restraining orders prohibiting the licensures.

The long answer is that plaintiffs were not entitled under the Fourteenth Amendment Due Process Clause to a hearing prior to the licensures. Except in emergency situations, the state cannot deprive a person of a protected liberty or property interest without affording the person notice and an opportunity for a hearing before the termination becomes effective. *Bd of Regents of State Colleges v Roth,* 408 US 564, 570, n 7; 92 S Ct 2701; 33 L Ed 2d 548 (1972); *Bell v Burson,* 402 US 535, 542; 91 S Ct 1586; 29 L Ed 2d 90 (1971). However, these procedural due process requirements apply only if there is to be a deprivation of interests which constitute "liberty" or "property." *Roth,* 408 US 569.

We cannot find any liberty or property interest of which the city would have been deprived by the issuance of the licenses prior to the administrative hearing. Any limitation on the city's power to regulate AFC facilities for six or less adults was validly imposed by the Legislature through the CVZA and AFCFLA (see Issues 3-5, above), not by the DSS.

We recognize that plaintiff homeowners have a protected property interest in the value, use, and enjoyment of their property, as well as a contractual right to enforce the restrictive covenants in their deeds. Nevertheless, plaintiffs failed to suffi-

adequate notice, any failure to notify the homeowners lies with the city.

ciently allege any *deprivation* of these property rights. Contrary to plaintiffs' repeated assertions, the issuance of a license does not rezone any property. The neighborhoods and lots on which the AFC small group homes are situated are still zoned for single-family, residential use. Section 3b(2) of the CVZA merely states that an AFC facility for six or less adults is a residential use of property. As will be more fully explained in Issue 11, below, the operation of these homes does not constitute a multifamily or commercial use; nor does it violate any restrictive covenants. Finally, plaintiffs failed to allege sufficient facts concerning any diminution in the value,[24] or interference with the use and enjoyment,[25] of their property caused by the licensures.[26]

As to plaintiffs' final argument concerning the partiality of the Director of the DSS, we initially note that the right to a hearing before an unbiased and impartial decisionmaker is a basic requirement of due process. *Withrow v Larkin,* 421 US 35, 46; 95 S Ct 1456; 43 L Ed 2d 712 (1975); *Crampton v Dep't of State,* 395 Mich 347, 350-351; 235 NW2d 352 (1975). Moreover, the Administra-

[24] Plaintiff homeowners did not submit any evidence that the value of their property has or will decline, or that they have been unable to sell their property, because of their proximity to an AFC small group home. Defendants and amici curiae note that some studies of residential areas with AFC-type facilities reveal no significant long-term change in property values.

[25] Plaintiffs alleged increased traffic and parking problems near the AFC small group homes, but did not allege that such problems had interfered with the value, use, or enjoyment of their property.

[26] Plaintiff homeowners also argue that the AFCFLA (presumably § 23) violates the Fourteenth Amendment's Equal Protection Clause because only the city is allowed to contest the proposed licensure of an AFC facility and receive a hearing. This argument overlooks § 24 of the AFCFLA, MCL 400.724; MSA 16.610(74). This section allows an individual who believes that the AFCFLA or rules promulgated thereunder may have been violated to request an investigation, obtain an administrative hearing, and appeal an adverse decision to circuit court.

tive Procedures Act requires that administrative hearings be conducted in an impartial manner before an unbiased officer. MCL 24.279; MSA 3.560(179). Actual bias need not be shown. If the situation is one in which "experience teaches that the probability of actual bias on the part of a decisionmaker is too high to be constitutionally tolerable," the decisionmaker must be disqualified. *Withrow,* 421 US 47; *Crampton,* 395 Mich 351.

> Among the situations identified by the [*Withrow*] Court as presenting that risk are where the judge or decisionmaker
>     (1) has a pecuniary interest in the outcome;
>     (2) "has been the target of personal abuse or criticism from the party before him";
>     (3) is "enmeshed in [other] matters involving petitioner . . ."; or
>     (4) might have prejudged the case because of prior participation as an accuser, investigator, factfinder or initial decisionmaker. [*Crampton, supra.*]

The first situation is not applicable. As to the second, plaintiffs briefly assert that the Director of the DSS "has been the target of substantial public criticism . . . ." If plaintiffs are merely referring to the fact that communities and citizens, including plaintiffs, have publicly disagreed with the DSS' decisions to allow AFC facilities to operate in residential areas, we do not find that these comments rise to the level of "personal abuse or criticism." *Cf. Mayberry v Pennsylvania,* 400 US 455; 91 S Ct 499; 27 L Ed 2d 532 (1971).

As to the third situation, plaintiffs incorrectly assert that the director and the DSS were parties in the administrative proceedings. The adverse parties there were the city on one hand and the owners and operators of the AFC small group

homes on the other. The DSS, through the director and the hearing officer, was the decisionmaker.

Nevertheless, the director and the DSS were joined as defendants in the injunctive action which was initiated while the administrative proceedings were pending. However, that action had terminated in defendants' favor several months before the administrative hearing was held and the final decision was rendered. Although an appeal of the injunctive action was pending at that time, under the particular facts of this case we conclude that the director was not so immediately and personally "enmeshed" in the appellate proceedings as to automatically preclude him from rendering an impartial administrative decision. *Cf. Johnson v Mississippi,* 403 US 212; 91 S Ct 1778; 29 L Ed 2d 423 (1971).

As to the last situation, the director did not personally conduct the initial investigation of the applicants and facilities; nor did he preside as the factfinder during the administrative hearing. However, he did review the city's initial complaints and issued the final decision after reviewing the hearing officer's findings. Nevertheless, mere familiarity with the facts of a case obtained during the performance of a statutory duty does not disqualify a decisionmaker. Nor is disqualification required because the decisionmaker has taken a public position on an issue, unless there is a specific showing of incapability of judging that particular case fairly. *Hortonville Joint School Dist No 1 v Hortonville Ed Ass'n,* 426 US 482, 493; 96 S Ct 2308; 49 L Ed 2d 1 (1976).

In *Withrow, supra,* the United States Supreme Court discussed the propriety of allowing a state examining board to investigate a doctor and later suspend him on the basis of charges uncovered by the initial investigation. In upholding this combination of investigatory and adjudicative roles

against a procedural due process challenge, the Court made analogy to situations where a decision-maker is involved in both the initial and final adjudicative proceedings:

> Judges repeatedly issue arrest warrants on the basis that there is probable cause to believe that a crime has been committed and that the person named in the warrant has committed it. Judges also preside at preliminary hearings where they must decide whether the evidence is sufficient to hold a defendant for trial. Neither of these pretrial involvements has been thought to raise any constitutional barrier against the judge's presiding over the criminal trial and, if the trial is without a jury, against making the necessary determination of guilt or innocence. Nor has it been thought that a judge is disqualified from presiding over injunction proceedings because he has initially assessed the facts in issuing or denying a temporary restraining order or a preliminary injunction. . . .
>
> *       *       *
>
> The initial . . . determination of probable cause and the ultimate adjudication have different bases and purposes. The fact that the same agency makes them in tandem and that they relate to the same issues does not result in a procedural due process violation. Clearly, if the initial view of the facts based on the evidence derived from nonadversarial processes as a practical or legal matter foreclosed fair and effective consideration at a subsequent adversary hearing leading to ultimate decision, a substantial due process question would be raised. But in our view, that is not this case. [421 US 56, 58.]

Here, the director was not required to reevaluate his initial decision. Rather, his review was limited to the findings of fact and conclusions of law made by the hearing officer after an adversarial hearing. Although special facts and circumstances in a particular case may require disqualifi-

cation because of prior involvement, *id.,* p 58, plaintiffs have not alleged such facts.[27]

*The DSS' Failure to Comply With Statutory Notice Provisions (Issue 8)*

Section 32(1) of the AFCFLA, MCL 400.732(1); MSA 16.610(82)(1), requires the DSS to notify the clerk of a city, village, or township as to where a proposed AFC facility will be located at least forty-five days before a license is issued. Section 3b(4) of the CVZA, MCL 125.583b(4); MSA 5.2933(2)(4), similarly requires a state licensing agency to notify the council or designated agent of a city or village.

It is undisputed that the DSS notified the Livonia Bureau of Inspection in January and February, 1981, concerning the licensure of the three Livonia AFC small group homes. However, the bureau is not a designated agent of the city clerk or council for notification purposes. Nevertheless, city officials and concerned residents met on March 16, 1981, to discuss the proposed licensure. Moreover, the city attorney, on behalf of "the legislative body of the City of Livonia," sent letters of complaint to the DSS on March 19 and 20, 1981, and copies thereof to the council and city clerk. Plaintiffs filed the instant suits on April 1 and 2, 1981, and obtained temporary restraining orders preventing the proposed licensures. These orders were not dissolved until May 11, May 28, and July 20, 1981. Licensure in each case therefore occurred over forty-five days after the council and city clerk received actual, albeit indirect, knowledge of the DSS' plans.

---

[27] We reject plaintiffs' argument that the director's decision did not adequately state the reasons for rejecting the hearing officer's recommendation that the licenses be rescinded without prejudice. The director sufficiently stated that the DSS had "no legal obligation" (*i.e.,* no statutory or regulatory duty) to withhold licensure pending cooperation between the DMH and local units of government.

Plaintiffs submit that the statutory notice requirements are mandatory and jurisdictional in nature. Therefore, they believe that the licenses should be rescinded because of the DSS' technical noncompliance. We disagree. Although mandatory notice provisions cannot be ignored, *Krajenke Buick Sales,* 322 Mich 255, substantial compliance is sufficient. *Meredith v City of Melvindale,* 381 Mich 572, 579-580; 165 NW2d 7 (1969). Plaintiffs have not alleged, nor does the record reveal, that they were prejudiced by the noncompliance. See *Lisee v Secretary of State,* 388 Mich 32, 45; 199 NW2d 188 (1972); *Montiy v East Detroit Civil Service Bd,* 54 Mich App 510, 515-516; 221 NW2d 248 (1974).

*Additional Statutory and Ordinance Violations (Issue 9)*

Plaintiffs allege four additional violations of law which allegedly would preclude licensure of the Livonia homes. First, they maintain that the DSS has acted with "complete indifference to the views of the City of Livonia and its citizens" in processing defendants' license applications, in violation of § 9(2) of the AFCFLA. That section provides in pertinent part:

> The department [DSS] shall cooperate with other state departments and agencies and local units of government in administering this act. [MCL 400.709(2); MSA 16.610(59)(2).]

The only allegation of noncooperation appears in ¶ 39(e) of plaintiffs' complaints. That paragraph states that representatives of the DSS or the DMH did not attend a March 16, 1981, meeting of city officials and concerned residents regarding the locations of the three AFC homes. The Director of the DSS responded that the DSS was not aware of,

or invited to attend this meeting. Nevertheless, representatives of the DSS and the DMH did attend an April 2, 1981, meeting. The hearing officer found that the evidence presented did not establish that the DSS had failed to cooperate with the city.[28] Since this finding is supported by competent, material, and substantial evidence, MCL 24.306(1)(e); MSA 3.560(206)(1)(e), we agree that no violation of § 9(2) occurred.[29]

Second, plaintiffs believe that the DSS violated § 13(4) of the AFCFLA, MCL 400.713(4); MSA 16.610(63)(4), because it did not include the names of any lessors of the Livonia homes in the notices of application for licensure sent to the city. Section 13(4) requires an applicant to disclose *to the DSS* the names of any lessors of the real estate on or in which the AFC facility will be located. Section

[28] The hearing officer nevertheless found that the DMH had not cooperated with the city, in accordance with its departmental guidelines and procedures. We note that MCL 330.1244(g); MSA 14.800(244)(g), added by 1980 PA 423, effective March 31, 1981, similarly requires the DMH to seek the advice and consultation of a city prior to planning and locating a "specialized residential service" in the community. However, this section became effective after the site-selection process was completed in each case and therefore is inapplicable. More importantly, plaintiffs did not name the DMH as a defendant and relied solely on the DSS' alleged violation of § 9(2) of the AFCFLA. We agree with the conclusion of the Director of the DSS that nothing in the AFCFLA or rules promulgated thereunder requires the DSS to withhold licensure until the DMH complies with its departmental procedures. This conclusion, however, does not mean that the city cannot initiate an action to compel the DSS or the DMH to fulfill their statutory duty to cooperate.

[29] The Court of Appeals in *Livonia I*, 119 Mich 811, concluded that the DSS could be permanently enjoined from issuing licenses, including the instant licenses, if it had repeatedly failed to cooperate with other municipalities. Since past compliance was a question of fact and the evidence presented by the parties was insufficient to decide the question on review, the case was remanded for further proceedings.

Remand was an inappropriate disposition. Plaintiffs never alleged that the DSS had previously failed to comply with § 9(2); nor did they seek to enjoin the DSS from issuing any future licenses. Plaintiffs merely sought to enjoin the issuance of the three licenses at issue here on the basis of the DSS' alleged noncompliance with § 9(2) in these cases.

12(3), MCL 400.712(3); MSA 16.610(62)(3), states that the application for licensure and material submitted therewith shall be confidential. However, § 12(3) further provides that these materials shall be open to a party in a contested case involving the facility. Therefore, the names of any lessors were properly omitted from the notices of application sent to the city, but plaintiffs were entitled to this information under § 12(3) once they contested the proposed licensures.

Third, plaintiffs maintain that each of the Livonia homes are in violation of several building, plumbing, electrical, heating, and fire code regulations and ordinances. As noted in Issue 5, § 33 of the AFCFLA allows the city to enforce local construction codes which are applicable to private residences. All other local regulations and ordinances are superseded. The DSS nevertheless has promulgated extensive fire and safety rules for AFC small group homes providing care to six or less adults. See 1984 AACS, R 400.1601-400.1613. At the time the licenses were issued to the Livonia homes, 1979 AC, R 400.2113(1) allowed the DSS to issue a temporary license to a new applicant if a preliminary investigation indicated that the applicant had the capacity to meet licensing requirements. Items of noncompliance could not constitute "an immediate clear and present threat to the health, safety or well-being of any resident." These deficiencies nevertheless had to be corrected within a reasonable period of time. 1979 AC, R 400.2112(8).[30] None of the violations mentioned by plaintiffs constituted an immediate clear and present danger to the residents, and defendant licens-

---

[30] Under the present rules, the DSS may grant an exemption from an administrative rule if there is clear and convincing evidence that the alternative complies with the intent of the rule. The DSS may include conditions under which the exemption is granted. 1984 AACS, R 400.1613.

ees apparently had the capacity to remedy them. However, if any remaining violations exist which may be legitimately enforced, they should be remedied forthwith.

Finally, plaintiffs believe that the operation of the AFC small group homes should have been permanently enjoined under § 7 of the CVZA, MCL 125.587; MSA 5.2937. Section 7 states that uses which violate local zoning ordinances constitute nuisances per se which may be abated by an injunction. However, since AFC small group homes for six or less adults constitute a residential use of property under § 3b(2) of the CVZA, no local zoning ordinances have been violated.

*Placement of Mentally Ill Persons in AFC Small Group Homes (Issue 10)*

Plaintiffs maintain that mentally ill adults cannot be placed in AFC small group homes under the 1979 AFCFLA. The Court of Appeals in *Livonia I* and *II* correctly declined to address this issue, since the parties have stipulated that no mentally ill adults would be placed in any of the three Livonia homes. However, the issue is squarely presented in *Greentrees,* since there is evidence that the residents of the Southfield home are mentally ill as well as developmentally disabled. The DSS maintains that it has consistently interpreted both the 1972 and 1979 AFCFLA to allow placement of mentally ill adults in all AFC facilities.

The 1972 AFCFLA did not designate the categories of adults who could reside in AFC facilities. It merely defined an AFC facility as "an establishment which provides supervision, assistance, protection or personal care, in addition to room and board, to adults." 1972 PA 287, § 2(b), former MCL

331.682(b); MSA 16.610(2)(b). The 1979 AFCFLA definition is significantly more detailed:

> "Adult foster care facility" means a governmental or nongovernmental establishment having as its principal function the receiving of adults for foster care. It includes facilities and foster care family homes for adults who are aged, *emotionally disturbed,* developmentally disabled, or physically handicapped who require supervision on an ongoing basis but who do not require continuous nursing care. Adult foster care facility does not include any of the following:
>
> *  *  *
>
> (d) A hospital for the *mentally ill* . . . operated by the department of mental health under Act No. 258 of the Public Acts of 1974, as amended, being sections 330.1001 to 330.2106 of the Michigan Compiled Laws. [MCL 400.703(4); MSA 16.610(53)(4). Emphasis added.]

An AFC small group home is simply defined as *"an adult foster care facility* with the approved capacity to receive 12 or fewer adults . . . ." MCL 700.703(7); MSA 16.610(53)(7) (emphasis added). Similarly, the definitions of AFC camps and family homes do not specifically refer to the categories of adults who may reside therein. See MCL 400.703(2), (5); MSA 16.610(53)(2), (5). In contrast, the original definitions of AFC large group homes and congregate facilities did contain such references. After defining the capacity of each of these AFC facilities, the following provision appeared:

> Beginning 4 years after the effective date of this act, an adult foster care congregate facility [or large group home] which is licensed by the department to provide foster care in each respective category may receive only those adults in a category whose primary need for services is based upon only 1 of the following categories:

(a) Aged condition.

(b) *Mental illness,* developmental disability, or physical handicap, or a combination of *mental illness,* developmental disability, or physical handicap. [1979 PA 218, § 3(3), (6), codified at MCL 400.703(3), (6); MSA 16.610(53)(3), (6). Emphasis added.]

Finally, the 1979 AFCFLA does not define the term "emotionally disturbed," but it does define "mental illness":

"Mental illness" means a substantial disorder of thought or mood which significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life. [MCL 400.705(4); MSA 16.610(55)(4).]

This definition is identical to the definition of "mental illness" contained in § 400a of the Mental Health Code, MCL 330.1400a; MSA 14.800(400a).

Plaintiffs argue that the terms "emotionally disturbed" and "mentally ill" are mutually exclusive—the former term describes a person with psychological problems that do not rise to the level of a substantial impairment of thought or mood which significantly impairs certain aspects of a person's life. The inclusion of the term "mental illness" in the definitions of AFC large group homes and congregate facilities means that mentally ill adults may reside only in these larger facilities. Plaintiffs conclude that since an AFC small group home is defined only as an "AFC facility" and the general definition of "AFC facility" refers only to emotionally disturbed adults, mentally ill adults cannot be placed in AFC small group homes. (Similar logic would also preclude the placement of mentally ill adults in AFC family homes and adult camps.)

The majority of the *Greentrees* Court rejected plaintiffs' arguments for the reasons stated in *Oxford Twp v Dep't of Social Services, supra.* We need not examine the validity of the Court's reasoning since an examination of recent legislation and the Mental Health Code makes it clear that all AFC facilities may provide foster care to mentally ill persons.

The provision requiring large group homes and congregate facilities to choose the type of adult to whom they would provide services reflected the Legislature's original intent to place homes for the aged under the control of the DSS and the licensing provisions of the 1979 AFCFLA by March 27, 1984 (the fourth anniversary of the enactment of the 1979 AFCFLA).[31] See House Legislative Analysis of HB 4104. However, the Legislature subsequently decided against this change and struck from the AFCFLA all references to homes for the aged. See 1984 PA 40 and House Legislative Analysis of HB 5410. The aforequoted provision contained in § 3(3) and (6) was one of these deletions.

Thus, as presently written, the only reference to "emotionally disturbed" in the AFCFLA appears in the general definition of AFC facility in § 3(4). The only reference to "mentally ill," apart from the statutory definition in § 5(3), appears in the exclusion of hospitals for the mentally ill from the definition of AFC facility in § 3(4)(d). There is now no statutory basis for concluding that mentally ill adults can be placed only in larger AFC facilities. If mentally ill adults can be placed in one kind of AFC facility, they can be placed in any size facility.

Although there is no statutory definition of "emotionally disturbed" for purposes of placing

---

[31] Homes for the aged were and are under the control of the Department of Public Health, pursuant to part 213 of the Public Health Code, MCL 333.21301 *et seq.;* MSA 14.15(21301) *et seq.*

adults into AFC facilities,[32] the Legislature contemplated that AFC facilities could be used as a "mainstreaming" mechanism for persons who have been hospitalized for their psychological problems. The Mental Health Code requires county mental health programs and state facilities to "develop an individualized pre-release plan for appropriate community placement and a prerelease plan for aftercare services appropriate for each individual" who has been hospitalized. MCL 330.1209a(1); MSA 14.800(209a)(1). MCL 330.1209b; MSA 14.800(209b) contains a specific reference to placement of individuals "in a supervised community living arrangement, such as a foster home, group care home, nursing home, or other facility . . . ."

The House Legislative Analysis of HB 5256 (the bill which added the prerelease planning sections to the Mental Health Code),[33] clearly shows the Legislature's preference for community-based care of mentally ill persons:

THE APPARENT PROBLEM:
With the emphasis now placed on transferring persons from state mental health institutions to

[32] 1984 PA 186, which added Chapter 4A to the Mental Health Code, MCL 330.1498a-s; MSA 14.800(498a-s), does contain a definition of "emotional disturbance":

" 'Emotional disturbance' means mental illness as defined in section 400a, or a severe or persistent emotional condition characterized by seriously impaired personality development, individual adjustment, social adjustment, or emotional growth, which is demonstrated in behavior symptomatic of that impairment." 1984 PA 186, § 498b(9), MCL 330.1498b(9); MSA 14.800(498b)(9). (Emphasis added.)

This definition seriously undercuts plaintiffs' argument that the Legislature intended that the terms "emotionally disturbed" and "mentally ill" describe mutually exclusive states of mind. We do not base our decision on this statutory definition, however, because it appears in a chapter which addresses the procedures for civil admission and discharge of emotionally disturbed minors. Minors cannot be placed in AFC facilities. See MCL 400.703(1); MSA 16.610(53)(1).

[33] HB 5256 was enacted as 1980 PA 409.

community treatment programs, the need for better pre-release planning of aftercare services for persons in community placements has become apparent. Of critical importance in this process are the 55 county and multi-county community mental health programs in the state, whose job it is to provide mental health services to persons living in their areas. . . .

\* \* \*

"*Each local mental health authority will assure the delivery of . . . residential, and* inpatient *programs to all persons in its service area who are impaired by or at risk of* developmental disability, *emotional disturbance, or mental illness . . . ."*

ARGUMENTS:

FOR:

The bill would ensure continuity of care for most persons released from state mental health institutions into the community and would facilitate the process of deinstitutionalization. The bill would enhance the long-term effectiveness of mental health treatment for these individuals by providing planning for appropriate community placement and aftercare services, and could thereby decrease the number of them who might otherwise be institutionalized again in the future.

\* \* \*

FOR

The knowledge that a plan for aftercare services existed for mental health services recipients living in the community, and that the local county program was responsible for regularly reviewing the appropriateness of such treatment, could eliminate some of the opposition to community mental health facilities and enhance the prospects for public acceptance of community-based mental health treatment. [Emphasis added.]

We note, however, that although mentally ill persons may be placed in AFC facilities, not every mentally ill person is a proper candidate for such

placement. AFC facilities are not designed to render "treatment" to persons with psychological problems. The principal function of an AFC facility is providing foster care. "Foster care" is defined in § 4(5) of the AFCFLA as "the provision of supervision, personal care, and protection in addition to room and board . . . ." MCL 400.704(5); MSA 16.610(54)(5). "Supervision," "personal care," and "protection" are also specifically defined in the act:

"Supervision" means guidance of a resident in the activities of daily living, including all of the following:

(a) Reminding a resident to maintain his or her medication schedule, as directed by the resident's physician.

(b) Reminding a resident of important activities to be carried out.

(c) Assisting a resident in keeping appointments.

(d) Being aware of a resident's general whereabouts even though the resident may travel independently about the community. [MCL 400.707(5); MSA 16.610(57)(5).]

"Personal care" means personal assistance provided by the licensee or an agent or employee of the licensee to a resident who requires assistance with dressing, personal hygiene, grooming, maintenance of a medication schedule as directed and supervised by the resident's physician, or the development of those personal and social skills required to live in the least restrictive environment. [MCL 400.706(1); MSA 16.610(56)(1).]

"Protection" means the continual responsibility of the licensee to take reasonable action to insure the health, safety, and well-being of a resident, including protection from physical harm, humiliation, intimidation, and social, moral, financial, and personal exploitation while on the premises, while under the supervision of the licensee or an agent

or employee of the licensee, or when the resident's assessment plan states that the resident needs continuous supervision. [MCL 400.706(4); MSA 16.610(56)(4).]

Noticeably absent from the AFCFLA is any reference to "treatment." "Treatment" is defined in the Mental Health Code as "care, diagnostic, and therapeutic services including the administration of drugs, and any other service for the treatment of an individual." MCL 330.1400(e); MSA 14.800(400)(e). A mentally ill individual who is adjudicated to be a "person requiring treatment" pursuant to the Mental Health Code can be involuntarily hospitalized. MCL 330.1468, 330.1476(2); MSA 14.800(468), 14.800(476)(2). "Person requiring treatment" is defined as a person who, in addition to being mentally ill, may injure himself or others, or is unable to attend to his basic physical needs. MCL 330.1401; MSA 14.800(401). An individual can be voluntarily hospitalized if he is deemed to be clinically suitable for hospitalization. MCL 330.1411, 330.1415; MSA 14.800(411), 14.800(415). Neither type of person can be initially placed in an AFC facility because of his treatment needs. The Legislature did not intend that placement in an AFC facility could take the place of hospitalization. Nor were AFC facilities designed to provide treatment to their residents.

Once an individual is no longer deemed a person requiring treatment or a person suitable for hospitalization, the individual may be a suitable candidate for placement in an AFC facility. However, AFC small group homes for six or less adults cannot "accept or keep a person whose behavior requires isolation or restraint and shall not admit a person whose present care requirements and service needs are incompatible with those of other

residents in the group home." 1984 AACS, R 400.2303(4).

## Violations of Building and Use Restrictions in Homeowners' Deeds (Issue 11)

Plaintiffs claim that restrictive covenants contained in the deeds of the homes operated by defendants Human Services and Aftercare, Inc., and R. Roberts Residential Services[34] effectively prohibit the operation of AFC small group homes in these houses. The pertinent covenants concerning the Human Services home are:

> No lot shall be used except for residential purposes. No building shall be erected, altered, placed, or permitted to remain on any Lot other than one detached single-family dwelling not to exceed two and one-half stories in height and a private garage for not more than two cars.
>
> \*   \*   \*
>
> No noxious or offensive activity shall be carried on upon any Lot, nor shall anything be done thereon which may become an annoyance or nuisance to the neighborhood.

The relevant covenant concerning the Roberts home states:

> No noxious or offensive trade nor any manufacturing shall be carried on upon any lot, nor any second hand merchandising or wrecking business be maintained upon any lot, nor shall anything be done thereon which may be or become an annoyance or nuisance to the neighborhood.[35]

[34] Plaintiffs do not raise this issue as to the Brant home, since it was litigated in a separate lawsuit which is not before us. The Southfield home is not governed by any restrictive covenants.

[35] There is also a covenant applicable to both homes which forbids using a basement as a residence. Since there is no record evidence to

Plaintiffs allege that a single family is not residing in either home and that the operation of an AFC small group home is a commercial, albeit nonprofit, use of the property. They point to the hearing officer's finding that traffic has increased in the neighborhood, that there are parking problems, and that the operation of the homes constitutes a commercial or business use.

We initially note that neither the AFCFLA nor the CVZA purport to regulate private restrictive covenants.[36] "Zoning laws determine property owners' obligations to the community at large, but do not determine the rights and obligations of parties to a private contract. These are separate obligations, both of which may be enforceable." *Rofe v Robinson,* 415 Mich 345, 351; 329 NW2d 704 (1982).

Restrictive covenants in deeds are strictly construed against parties seeking to enforce them. All doubts are resolved in favor of the free use of property. *Boston-Edison Protective Ass'n v Paulist Fathers, Inc,* 306 Mich 253, 258-259; 10 NW2d 847 (1943); *Wood v Blancke,* 304 Mich 283, 287; 8 NW2d 67 (1943). Nevertheless, restrictions which are clear on their face, reasonable in scope, and do not violate public policy will be upheld. *Oosterhouse v Brummel,* 343 Mich 283, 287; 72 NW2d 6 (1955); *Grant v Craigie,* 292 Mich 658, 661; 291 NW 44 (1940). Restrictions for residence purposes are particularly favored by public policy and are valuable property rights. *Oosterhouse, supra; Wood,* 304 Mich 288.

Only the covenants pertaining to the Human

support plaintiffs' allegation that the basements in these homes will be used as residences, we will not address this argument.

[36] *Cf.* § 1566.5 of the California Community Facilities Act, as discussed in *Welsch v Goswick,* 130 Cal App 3d 398, 406-407; 181 Cal Rptr 703 (1982).

Services home specifically limit the type of structure that can be built (single family dwelling) and the purposes to which the structure can be put (residential). There is no dispute that the Human Services house is a single family dwelling. Nevertheless, restrictive covenants regulating the type of permissible structures that can be erected also contemplate that the use and occupancy of the property will be similarly restricted. *Basset Building Co v Jehovah Evangelical Lutheran Church,* 371 Mich 459, 463; 124 NW2d 236 (1963); *Wood,* 304 Mich 287. Thus, we must determine whether the six developmentally disabled adults, plus any resident caretakers, living in the Human Services home constitute a single family and whether the house is being used for residential purposes.

"Family" is not defined in the covenant.[37] However, this Court has construed the term to include more than just a nuclear or extended family whose members are related by consanguinity, marriage, or adoption. As early as 1883, this Court stated:

> Now this word "family," contained in the statute, is an expression of great flexibility. It is applied in many ways. It may mean the husband and wife having no children and living alone together, or it may mean children, or wife and children, or blood relatives, or any group constituting a distinct domestic or social body. It is often used to denote a small select corps attached to an army chief, and has even been extended to whole sects, as in the case of the Shakers. [*Carmichael v*

---

[37] In *McMillan v Iserman,* 120 Mich App 785, 793-795; 327 NW2d 559 (1982), the restrictive covenant at issue specifically prohibited the use of lots for state-licensed group residential facilities. This author concluded that the covenant was unenforceable because it violated this state's public policy of promoting quality programs and facilities for the mentally handicapped. Similarly, in *Craig v Bossenbery,* 134 Mich App 543, 553; 351 NW2d 596 (1984), the Court of Appeals, on the basis of *McMillan,* struck down on public policy grounds a covenant which defined "family" in such a way as to exclude residents of AFC small group homes.

*Northwestern Mutual Benefit Ass'n,* 51 Mich 494, 496; 16 NW 871 (1883).][38]

We have construed the term "family" in a restrictive covenant to include a household of five priests, *Boston-Edison, supra,* and have struck down a zoning ordinance which arbitrarily defined "family" to include only a traditional family unit plus one unrelated adult. *Delta Charter Twp v Dinolfo, supra.*

The adults who reside in the Human Services home function as a fixed housekeeping and social unit. For the reasons stated in *Malcolm v Shamie,* 95 Mich App 132, 136-137; 290 NW2d 101 (1980), we conclude that the home is being occupied by a single family and is being used for residential purposes:

> Five mentally retarded women living with a foster parent in an environment therapeutically designed to emulate a more conventional family environment should also be considered a family, and such use of the property, an appropriate family residential use. The residents are more than a group of unrelated individuals sharing a common roof. They do not have natural families on which to rely . . . . The substitute family provided by the group home allows the residents to lead more normal and meaningful lives within the community than would be feasible were they institutionalized.
>
> \* \* \*
>
> The facts in the case at bar do not connote a temporary living arrangement. . . . [T]he inhabitants of the foster care facility will live there on a permanent, year-round basis and will, other than a

---

[38] Nevertheless, where fraud, bad faith, or a violation of public policy is inherent in a particular situation, we have defined "family" narrowly. See *McDonald v Kelly Coal Co,* 335 Mich 325; 55 NW2d 851 (1952); *Mutual Benefit Ass'n of Michigan v Hoyt,* 46 Mich 473; 9 NW 497 (1881)..

blood relationship, comprise all the elements of a family.

Numerous decisions from other states have similarly concluded that persons living together in residential group homes constitute a "single family" or that the operation of such homes constitutes a residential use of property. See, *e.g., Concord Estates Homeowners Ass'n, Inc v Special Children's Foundation, Inc,* 459 So 2d 1242 (La App, 1984); *Knudtson v Trainor,* 216 Neb 653; 345 NW2d 4 (1984); *Crane Neck Ass'n, Inc v NYC/ Long Island Co Services Group,* 92 AD2d 119; 460 NYS2d 69 (1983), *aff'd* 61 NY2d 154; 472 NYS2d 901; 460 NE2d 1336 (1984), *cert den* 469 US 804 (1984); *Welsch v Goswick,* 130 Cal App 3d 398; 181 Cal Rptr 703 (1982); *Costley v Caromin House, Inc,* 313 NW2d 21 (Minn, 1981); *J T Hobby & Son, Inc v Family Homes of Wake Co,* 302 NC 64; 274 SE2d 174 (1981); *Crowley v Knapp,* 94 Wis 2d 42; 288 NW2d 815 (1980); *State ex rel Region II Child & Family Services, Inc v Eighth Judicial Dist Court,* 187 Mont 126; 609 P2d 245 (1980); *Berger v State,* 71 NJ 206; 364 A2d 993 (1976).[39]

We reject plaintiffs' attempt to characterize the operation of an AFC small group home as a business or commercial use of property. Since these homes are not allowed to provide continuous nursing care or psychiatric treatment, they are not

---

[39] Contrary conclusions were reached in *London v Handicapped Facilities Bd of St Charles Co,* 637 SW2d 212 (Mo App, 1982), and *Shaver v Hunter,* 626 SW2d 574 (Tex App, 1981), *cert den* 459 US 1016 (1982), primarily because prior case law in those states had construed the term "family" to include only nuclear or extended family units. In *Omega Corp of Chesterfield v Malloy,* 228 Va 12; 319 SE2d 728 (1984), *cert den* 469 US 1192 (1985), the parties agreed that group homes for the mentally retarded constituted a residential use of property. The Virginia Supreme Court held that although the mentally retarded adults could be considered a single family, the presence of counselors and their constant supervision of the occupants destroyed the familial nature of the use.

institutional in nature. The fact that the adults may be required to pay for certain items and services, see MCL 400.727(2)(b); MSA 16.610(77)(2)(b), does not of itself transform the nature of the activities conducted in the home from residential to commercial. *Concord Estates,* 459 So 2d 1244; *Costley,* 313 NW2d 26; *J T Hobby,* 302 NC 72-73. The only fact plaintiffs point to is the increased traffic and parking problems. These concerns fall more within the covenant in each home's deed prohibiting activities which constitute an annoyance or nuisance. However, the same problems could have arisen if a large traditional family with several cars and numerous visitors had moved into the homes. See *Dinolfo,* 419 Mich 273. The covenants contemplate more than just traffic problems. *Cf. Wood, supra* (breeding and raising racing pigeons in a garage).

We therefore find no violation of any restrictive covenants.[40]

*Propriety of Summary Judgment for Defendants (Issue 12)*

In all three Livonia cases, defendants were granted summary judgment pursuant to GCR 1963, 117.2(3). Under this former court rule, a trial court could grant summary judgment to a moving party if there was no genuine issue of material fact and that party was entitled to judgment as a matter of law. This determination was made upon a review of all affidavits, pleadings, depositions, admissions, and documentary evidence submitted by the parties and all reasonable inferences that could be drawn therefrom. GCR 1963, 117.3. Although courts are liberal in finding a genuine

---

[40] Since our decision is based upon an interpretation of the covenants, rather than a finding that the AFCFLA or CVZA conflicts with the covenants, we need not consider plaintiffs' "impairment of contract" argument.

issue of material fact and will give the opposing party the benefit of any reasonable doubt, *Rizzo v Kretschmer,* 389 Mich 363, 372; 207 NW2d 316 (1973), plaintiffs have failed to point out, and we cannot find, any material factual dispute. All of the issues presented by plaintiffs involved disputes of law which were correctly resolved in defendants' favor.

## V

The decision of the Court of Appeals in *Livonia I* is affirmed, except insofar as a remand for further proceedings was ordered.[41]

The decision of the Court of Appeals in *Livonia II* is affirmed.

The decision of the Court of Appeals in *Greentrees* is affirmed.

WILLIAMS, C.J., and LEVIN, RYAN, BRICKLEY, and BOYLE, JJ., concurred with CAVANAGH, J.

RILEY, J., took no part in the decision of these cases.

---

[41] See n 29.